Marlon BLAIZE, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CF–86.

District of Columbia Court of Appeals.

Submitted Jan. 25, 2011.
Decided June 9, 2011.

Michael L. Spekter, Washington, DC, appointed by the court, for appellant.

Ronald C. Machen, Jr., United States Attorney, Angela M. Miller, Special Assistant United States Attorney, Elizabeth Trosman, Chrisellen R. Kolb and Robert Feitel, Assistant United States Attorneys, for appellee.

Before THOMPSON, Associate Judge, and FERREN and FARRELL, Senior Judges.

THOMPSON, Associate Judge:

A jury convicted appellant Marlon Blaize of voluntary manslaughter while armed, assault with a dangerous weapon (ADW), carrying a pistol without a license, and two counts of possession of a firearm during a crime of violence (PFCV), all in connection with a shooting and subsequent hit-and-run accident that occurred in the 1400 block of Fairmont Street, N.W., on the evening of August 12, 2006. Appellant contends that the trial court plainly erred when it "failed to charge the jury ... [that] the hit and run driver ... was an intervening cause" of the death of the victim, Terran Miller; that the court abused its discretion in permitting a medical examiner to give her opinion that the "ultimate cause of [Miller's] death was appellant firing a gun"; that the evidence of causation was insufficient to support his conviction for voluntary manslaughter; and that his PFCV convictions merge. We disagree and affirm.

## I.

On the evening of August 12, 2006, Miller, Niam Pannell, Jenel ("London") Buie, and appellant were together on Fairmont Street, N.W., "chilling," drinking vodka, and, in the case of Miller, Pannell, and London, using drugs. According to Pannell, Miller was intoxicated and was "having difficulty walking" and was "buzzing." An argument arose between appellant and Miller. According to Kenyatta Howard, who witnessed the events from her window overlooking Fairmont Street, appellant eventually started "yelling ... loud[ly]" and then "took [his] gun out"—a long sil-

ver revolver—and "point[ed] the gun ... in the direction of [Miller]," "[t]oward [Miller's] chest" and "[at] his head." After Pannell tried to "separate ... both [Miller and appellant]" and "to calm [them] down," appellant put the gun away.

As appellant was walking away, Pannell saw Miller "[come] behind [appellant] and ... charg[e] at [appellant]."[1] Appellant "then took [his] gun out" and fired four to six shots in the air. Howard testified that appellant "turned and started firing his weapon toward [Miller] like target practice." She explained that appellant "was firing the gun directly at [Miller]. Wherever [Miller] went that's where [appellant] went." When the shooting began, Pannell fled the scene on his bicycle. Miller began "dodging" behind parked cars, while in a "crouching position trying to duck," and "running low [to the ground]" with his "[head] bent over." At the same time, the driver of "[a] car that was parked illegally" "got scared and just sped off of the block," traveling "80 or 90 miles [per] hour." London, who had immediately run from the sidewalk into the street when the shooting began, was almost hit by the speeding car. Miller "ran in[to] the street trying to get across to the other building" and—unlike London—actually was hit by the speeding car. London testified that "before the last two shots was [sic] fired[,] the car rolled up and [Miller] was then hit by the car and the car never stopped." She estimated that approximately "2.5 seconds" passed between the time the gun went off and Miller was hit by the car. Howard estimated the time as "five seconds."

Miller was left bleeding and motionless in the street. The driver of the car that hit him "just kept going" and never

1. Neither London nor Howard testified that Miller charged at appellant; rather, both testified that Miller and appellant simply walked away from each other.

stopped. Miller was taken to Washington Hospital Center and admitted to the intensive-care unit. He died on August 18, 2006, from the injuries he sustained after being struck by the car on August 12.

## II.

### A. Instruction on Causation/Insufficiency of the Evidence

■ During a discussion of proposed jury instructions, the trial court informed the parties that it was "inclined to just provide the first paragraph" of instruction No. 4.26 "Murder and Manslaughter–Causation," from the CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (4th ed. rev.2007).[2] Defense counsel responded, "That's fine with me."[3] Thereafter the trial court gave the jury an instruction that closely tracked the language of that standard instruction:

> A person causes the death of another person if his actions are a substantial factor in bringing about death and if death is a reasonably foreseeable consequence of his actions.

> Death is reasonably foreseeable if it is something that should have been foreseen as being reasonably related to the Defendant's actions.

■ Appellant now argues that the trial court plainly erred by not including in its instructions to the jury an instruction on the concepts of intervening, superseding cause, and proximate causation (instructions that appellant asserts would have enabled the jury to find that the hit-and-run driver was an intervening cause that

"cut off any criminal culpability" of appellant for Miller's death). Even if appellant did not waive this argument by indicating his satisfaction with the court's proposed instructions, he certainly failed to urge upon the court the instructions he now says were required. Accordingly, we will review his claim only for plain error. To prevail under plain error review, appellant must show "(1) error, (2) that is plain, (3) [and] that ... affected appellant's substantial rights, and (4) that the error seriously affected the fairness, integrity, or public reputation of the judicial proceeding, i.e., a showing of manifest injustice or a miscarriage of justice." *Bacchus v. United States*, 970 A.2d 269, 275 (D.C.2009). We find no error, plain or otherwise.

■ Our cases establish that "[a]n intervening cause will be considered a superseding legal cause that exonerates the original actor if it was so unforeseeable that the actor's ... conduct, though still a substantial causative factor, should not result in the actor's liability." *Butts v. United States*, 822 A.2d 407, 418 (D.C.2003) (citing RESTATEMENT (SECOND) OF TORTS § 440 (1965)). Regarding "proximate cause," we have said that "a criminal defendant proximately causes, and thus can be held criminally accountable for, all harms that are reasonably foreseeable consequences of his or her actions." *McKinnon v. United States*, 550 A.2d 915, 918 (D.C.1988). Here, the instruction that the trial court gave informed the jury that if Miller's death was not a reasonably foreseeable consequence of appellant's actions, then appellant could not be guilty of caus-

---

**2.** The first paragraph of instruction No. 4.26 provides:

A person causes the death of another person if [his/her conduct is a substantial factor in bringing about death, and if it was reasonably foreseeable that death or serious bodily injury could result from such con-

duct] [s/he inflicts an injury from which the other person dies.]

**3.** At a later discussion, immediately prior to the court's instructing the jury, defense counsel reiterated, "I'm satisfied with [the jury instructions] just like they are."

ing the death. We think this instruction was adequate to inform the jury that if another factor that was not reasonably foreseeable came into play and resulted in Miller's death, the jury could not find appellant responsible for causing Miller's death. Thus, we agree with the government that the more general instruction that the court gave sufficed to convey the specific principles that appellant urges the jury should have heard.[4]

■ Appellant's related contention is that, on the evidence presented, the jury could not rationally have found that Miller's death was a reasonably foreseeable consequence of the conduct with which appellant was charged. He argues that the government failed to prove that his actions—i.e., firing the gun in Miller's direction—were the proximate cause of Miller's death, and that the evidence therefore was insufficient to support his conviction of voluntary manslaughter.[5] We disagree.

■■ In reviewing claims of evidentiary insufficiency, we "view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Freeman v. United States,* 912 A.2d 1213, 1218 (D.C.2006) (citations and internal quotations omitted). We apply the principles that "the government is not re-

quired to negate every possible inference of innocence," and that "it is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Id.* at 1219.

■ "Proximate cause has two elements: a cause-in-fact element and a policy element." *Butts,* 822 A.2d at 417 (citing *Lacy v. District of Columbia,* 424 A.2d 317, 320 (D.C.1980)). A defendant's actions are considered the cause-in-fact of a person's death if those actions "contribute substantially to or are a substantial factor in a fatal injury." *Roy v. United States,* 871 A.2d 498, 507 (D.C.2005) (citing *Baylor v. United States,* 407 A.2d 664, 669–70 (D.C.1979)). "We have defined substantial cause as that conduct which a reasonable person would regard as having produced the fatal effect." *Id.* at 508 (citing *Butts,* 822 A.2d at 417).

■ The policy element of proximate cause is comprised of "various factors which relieve a defendant of liability even when his actions were the cause-in-fact of the injury." *District of Columbia v. Carlson,* 793 A.2d 1285, 1290 (D.C.2002). One such factor is foreseeability. *See McKinnon,* 550 A.2d at 917 ("A defendant is ... criminally responsible if 'the ultimate harm is something which should have been fore-

---

**4.** As appellant notes, the jury submitted a number of notes asking for clarification of the term "reasonably foreseeable." We do not discern that merely giving an intervening cause or proximate cause instruction would have provided that clarification, because, as the above quotations indicate, the term "reasonable foreseeability" is involved in both concepts.

**5.** For the jury to be able to find appellant guilty of voluntary manslaughter, the government had to establish (1) that appellant caused the death of Miller; (2) that at the time appellant did so, he intended to kill or

seriously injure Miller or acted in conscious disregard of an extreme risk of death or serious bodily injury to Miller; and (3) that appellant acted without justification or excuse (i.e., did not act in self-defense) (and the jury also had to find that appellant's "malice ... [was] negated by ... provocation," thus mitigating the offense from murder to manslaughter). *Comber v. United States,* 584 A.2d 26, 43 n. 19 (D.C.1990) (en banc). Appellant challenges the sufficiency of evidence only with respect to the first element: whether he "caused" Miller's death.

seen as being reasonably related to the acts of the accused.'"). That is, a defendant "may not be held liable for harm actually caused where the chain of events leading to the injury appears 'highly extraordinary in retrospect.'" *Majeska v. District of Columbia,* 812 A.2d 948, 951 (D.C.2002) (citing *Morgan v. District of Columbia,* 468 A.2d 1306, 1318 (D.C.1983) (en banc)).

Here, the jury heard evidence that only after appellant fired shots in Miller's direction did "everyone" attempt to flee, with Miller dodging behind parked cars and then running into the street in an effort to avoid being hit by the bullets. Thus, the jury was presented with evidence from which it could reasonably conclude that appellant's firing of his weapon in Miller's direction was a substantial factor not only in Miller's (and London's) fleeing into the street, but also in the driver of the car (that ultimately struck Miller) taking off at high speed when the gunfire erupted. The jury could reasonably find that, far from being unforeseeable or "highly extraordinary in retrospect," these attempts to flee quickly, and without careful attention to pedestrian safety, were entirely predictable.[6] From this evidence, the jury reasonably could find that appellant's firing of the gun foreseeably "produced the fatal effect," *Roy,*

871 A.2d at 508—i.e., caused Miller's death.

## B. Medical Examiner Testimony

■ Dr. Sarah Colvin, a deputy medical examiner with the Office of the Chief Medical Examiner, testified that she performed Miller's autopsy and concluded that he died from blunt-impact head trauma. She further testified that the manner of Miller's death was homicide, acknowledging that she classified Miller's death a homicide after reviewing the "police report and speaking with Detective Webb during the autopsy." Over appellant's objection, she explained:

[I]f a person ... is fleeing from gunfire, you don't go to the crosswalk ... look both ways, see if a car is coming across the street. Being fired upon then takes it out of the realm of chance. And chance is what is reserved for accidents. If you're hanging Christmas lights and you fall on your head, that's an accident. But when it becomes that the reason for your actions are because you are fearing for your life, that takes it into the realm of homicide for the medical professional.

Appellant argues that the trial court erred in permitting Dr. Colvin to testify that the manner of death was homicide and that the "ultimate cause of [Miller's] death was appellant['s] firing a gun."[7] In

**6.** The facts of this case are similar to those of *People v. Kern,* 75 N.Y.2d 638, 555 N.Y.S.2d 647, 554 N.E.2d 1235 (1990), in which the defendants were part of a band of youths who chased the victim Griffith while wielding bats and sticks. When Griffith ran across a six-lane highway in an effort to escape his assailants, he was struck by a car and killed. The Court of Appeals of New York held that the evidence was sufficient to support the defendants' convictions of second degree manslaughter, reasoning that "it was foreseeable and indeed probable that Griffith would choose the escape route most likely to dissuade his attackers from pursuit," and thus that the driver's operation of his automobile

"was not an intervening cause sufficient to relieve defendants of criminal liability for the directly foreseeable consequences of their actions." *Id.,* 555 N.Y.S.2d 647, 554 N.E.2d at 1246; *see also Bonhart v. United States,* 691 A.2d 160, 162 (D.C.1997) (explaining that if the intervening act "is the victim's own response to the circumstances that the defendant created, the victim's reaction must be an abnormal one in order to supersede the defendant's act").

**7.** A trial court's decision to admit or exclude evidence ordinarily is reviewed for abuse of discretion. *Goines v. United States,* 905 A.2d 795, 799 (D.C.2006) (citing *Mercer v. United*

allowing this testimony, appellant complains, the trial court permitted the government to elicit an opinion from its medical expert on the "mental state of the appellant" and regarding "the impact of his alleged actions on traffic" and on pedestrian conduct, matters "clearly outside of her area of expertise." He also asserts that Dr. Colvin's testimony "invaded the province of the jury."

Contrary to appellant's assertion that the medical examiner testified about "what was in the mind of ... appellant as he fired the gun," the medical examiner did not express an opinion about appellant's state of mind.[8] Rather, in explaining her conclusion that Miller's death was classified as a homicide for medical purposes, the medical examiner discussed generally the mental state of a hypothetical *decedent* (explaining that if the decedent took the ultimately fatal action out of fear for his life, the case enters "the realm of homicide for the medical professional"). Nor did the medical examiner testify to issues "outside her area of expertise" or invade the jury's province. Dr. Colvin testified that, when classifying the manner of death, a medical examiner chooses from five options—"natural, accident, suicide, homicide or undetermined." Importantly, she explained that a medical examiner's definition of homicide does not "equate to the court definition of murder or manslaughter or anything like that," but just means "death at the hands of another." In addition, under cross-examination, she acknowledged that she was not at the scene of the accident when Miller suffered his injuries, that her opinion was based upon what the police told her, and that she would not have been able to tell from her medical review alone the circumstances that led to Miller's sustaining trauma. We think this testimony kept Dr. Colvin's testimony within permissible bounds, and further that the court's instructions to the jury that it was "entirely up to [them] ... to decide what facts to find from the evidence received during this trial" was adequate to guard against usurpation of the jury's function.

## C. Merger

 Finally, we address appellant's argument that his two PFCV convictions (predicated on his ADW and voluntary manslaughter convictions) merge since there was "only one firearm and one victim." "Multiple PFCV counts d[o] not merge where the predicate crimes ... each stem[ ] from a fresh impulse." *Wages v. United States*, 952 A.2d 952, 964 (D.C.2008) (citation and quotation marks omitted). Here, the eyewitnesses described an initial confrontation between appellant and Miller, involving appellant's pointing a gun at Miller and telling Miller to "stop playing" with him. This initial

States, 724 A.2d 1176, 1182 (D.C.1999)). "The trial judge has wide latitude in the admission or exclusion of expert testimony, and his ... decision with respect thereto should be sustained unless it is manifestly erroneous." *Nixon v. United States*, 728 A.2d 582, 587 (D.C.1999).

8. Relying on Rule 704 of the Federal Rules of Evidence, appellant also contends that an expert witness may not "state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." However, "we have long held that the local law of evidence in this jurisdiction does not prohibit expert witnesses from stating opinions on ultimate facts or issues to be resolved by the jury." *Gaines v. United States*, 994 A.2d 391, 403 (D.C.2010); *see, e.g.,* *Wilkes v. United States*, 631 A.2d 880, 883 n. 7 (D.C.1993); *Lampkins v. United States*, 401 A.2d 966, 970 (D.C.1979). Therefore, even if the medical examiner had testified to ultimate facts, that testimony would not necessarily have been impermissible.

confrontation—ADW—resolved after Pannell talked with appellant to diffuse the situation and appellant put away his weapon and walked away from Miller. At this point, appellant reached a "fork in the road." *See Spain v. United States,* 665 A.2d 658, 660 (D.C.1995) ("If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment."). Rather than continue to walk away, appellant turned toward Miller, removed his gun from his waistband, and fired in Miller's direction, causing Miller to run into the street to his death—thus committing the second, separate offense of voluntary manslaughter. "[D]espite the proximity of the crimes in time and place, they constitute[d] distinct violent crimes, and [accordingly] the [associated] PFCV convictions do not merge." *Walker v. United States,* 982 A.2d 723, 742–43 (D.C.2009) (citing *Wages,* 952 A.2d at 964).

Wherefore, the judgment of conviction is

*Affirmed.*