27 A.3d 1164 (2011)
In re D.W., Appellant.
No. 08-FS-761.
District of Columbia Court of Appeals.
Argued May 26, 2011.
Decided September 1, 2011.
*1165 Mikel-Meredith Weidman, Public Defender Service, with whom James Klein, Public Defender Service, and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellant.
John Woykovsky, Assistant Attorney General for the District of Columbia, with whom Peter J. Nickles, Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, Rosalyn Calbert Groce, Deputy Solicitor General, and Sidney R. Bixler, Assistant Attorney General, *1166 were on the brief, for the District of Columbia.
Before GLICKMAN and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.
SCHWELB, Senior Judge:
Following an evidentiary hearing in this juvenile delinquency case, D.W. was adjudicated guilty of incest, in violation of D.C.Code § 22-1901 (2001). He appeals, contending that the evidence was insufficient to establish that D.W. and the victim were related "within . . . the fourth degree of consanguinity," as required under the statute. Because the uncontradicted testimony supports the trial judge's finding of guilt, we affirm.

I.
The underlying charges of incest and of first degree sexual abuse, in violation of D.C.Code § 22-3002(1) (2001), stem from a single incident of sexual intercourse between D.W., then aged 14, and D.S., then aged 11, which occurred in August of 2006 at the home of Willie Jones, the children's grandfather.[1] A pregnancy resulted, and D.S. gave birth to a baby boy at Washington Hospital Center on April 26, 2007. Genetic testing established a probability of 147,501,000 to 1 that D.W. was the father of the child.
At the evidentiary hearing resulting in his adjudication, D.W. did not dispute that the intercourse between him and D.S. took place. Rather, he moved for a judgment of acquittal (MJOA) at the close of the District's case, arguing that the evidence that D.W. and D.S. were related by blood was insufficient as a matter of law to establish his guilt of incest beyond a reasonable doubt. The trial judge denied the motion and, after the defense had presented its evidence, none of which was directed to contesting the incest charge, the judge found D.W. guilty of incest.[2] D.W. filed a timely appeal.

II.
At the evidentiary hearing, Donald Berry testified that he has five children, including the respondent, D.W. and the complaining witness, D.S. When he was asked whether he is the biological father of both children, Mr. Berry stated that "I have not [taken] a blood test, so I'm not positive that I'm the father, but yes, I'm considered the father."
D.S., the complainant, testified that she and D.W. have the same father and that D.W. is her brother. Referring to the sexual episode between her and D.W., D.S. explained that although D.W. "was my brother and I didn't want to do that with my brother," she also "didn't want nothing bad to happen to my brother." D.S. also testified that her baby son does not live with her, but with her father (i.e., Mr. Berry).
Keisha Simmons, the mother of D.S., confirmed that Mr. Berry is D.S.' father, and also stated that D.W. is Mr. Berry's *1167 son with another woman.[3] Willie Jones, who was called as a defense witness, testified that D.W. lives with him, and that both D.W. and D.S. are his grandchildren. No evidence contrary to any of the foregoing testimony was adduced by the defense.[4] As previously noted, the judge found D.W. guilty of incest.

III.
In assessing D.W.'s claim of evidentiary insufficiency, "this court must view the evidence in the light most favorable to the government, keeping in mind the right of the trier of fact to assess credibility and to draw reasonable inferences from the evidence." Long v. United States, 940 A.2d 87, 99 (D.C.2007); see also Rivas v. United States, 783 A.2d 125, 134 (D.C.2001) (en banc); In re T.M., 577 A.2d 1149, 1151 (D.C.1990) (juvenile delinquency proceeding). "The government is not required to negate every possible inference of innocence." Blaize v. United States, 21 A.3d 78, 82 (D.C.2011) (citations omitted). "It is only where there is no evidence upon which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." Id. (citations omitted); see also Kaliku v. United States, 994 A.2d 765, 786 (D.C.2010). Our review of the judge's findings is "deferential," Rivas, 783 A.2d at 134, because
the judge had a front seat as the testimony unfolded. We, on the other hand, are limited to a paper transcript which, while capturing the words of a case, may often miss its heart and soul.
Combs v. District of Columbia Dep't of Employment Servs., 983 A.2d 1004, 1010 n. 3 (D.C.2009); see also In re S.G., 581 A.2d 771, 779 (D.C. 1990). The sole question before us is whether, applying the foregoing standard of review, there is sufficient support in the record for the judge's finding that the District proved the requisite degree of consanguinityhere, that D.W. is the half-brother of D.S.beyond a reasonable doubt.[5] D.W. asks us to answer this question in the negative.
D.W.'s appellate counsel acknowledge in their reply brief that genetic testing is not required in every prosecution for incest. Nevertheless, they claim that in this case, in light of Mr. Berry's remark that in the absence of a blood test, he is not positive that he is the children's father, as well as the discrepancies as to how many children Mr. Berry has, scientific evidence was necessary in order to establish D.W.'s guilt. Specifically, counsel contend, and our dissenting colleague apparently agrees, that we should look for guidance to the statutory framework and body of case law addressing the adjudication of paternity in the civil context. Under the provisions of D.C.Code § 16-909(b-1) (2001), there are two ways to establish a "conclusive presumption of paternity": either by an affidavit from an approved laboratory certifying a genetic test indicating a 99% probability that the putative father *1168 is the father of the child, or by the father's written acknowledgment of paternity. Counsel argue that what they describe as Mr. Berry's equivocal testimony would not satisfy the requirements for a written acknowledgment of paternity, and that the District should therefore have been required to introduce the results of a genetic test in order to satisfy its burden of proof of consanguinity.[6]
We do not agree with D.W.'s position. In our view, D.W. overstates the "equivocal" nature of Mr. Berry's testimony when that evidence is viewed in the light most favorable to the District. When asked how many children he has, Mr. Berry answered that he has five, and he listed both D.W. and D.S. as being among them. In response to this initial question, he expressed no doubt at all. It was only after he had made this categorical and unqualified statement that he indicated any uncertainty resulting from the lack of a blood test. It is at least a permissible construction of Mr. Berry's remark that he is not "positive," when that comment is read in conjunction with his earlier testimony that both D.W. and D.S. are his children,[7] to take the two statements together as meaning that so far as Mr. Berry knows, he is their father, but that he is aware that one cannot be absolutely certain of that fact without a blood test. Assuming, arguendo, that there was some ambiguity as to Mr. Berry's level of certainty, the judge, as the trier of fact, had the right to draw any reasonable inference, and she was not required to take Mr. Berry's testimony as meaning that the witness entertained any appreciable or reasonable doubt that he was the children's father, especially when he had named both D.W. and D.S. as being his children.
For an appellate court to substitute its interpretation of Mr. Berry's evidence for the trial judge's factual finding would be especially inappropriate in circumstances such as those presented here. Judge Jerome Frank could easily have had in mind a case just like this one when he opined that
[a] stenographic transcript correct in every detail fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the words signify. The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried.
Broadcast Music v. Havana Madrid Rest. Corp., 175 F.2d 77, 80 (2d Cir.1949) (quoting *1169 ULMAN, THE JUDGE TAKES THE STAND 267 (1933)); see also Morris v. United States, 728 A.2d 1210, 1215 (D.C.1999) (quoting Broadcast Music). Here, the trial judge was in a position to discern Mr. Berry's tone and the comparative emphasis that the witness placed on the two statements, while we are unable to do so because, to adapt Judge Frank's phrase, our peach is indeed dehydrated. To second-guess the trier of fact, where the outcome may depend on the inflection of the witness' voice or the stress which he may have placed upon a particular word or sentence, is not an acceptable appellate option.[8]
It is also significant that Mr. Jones, having been called to the stand by D.W.'s attorney, testified that both D.W. and D.S. are his grandchildren. If this defense testimony was trueand D.W.'s counsel did not contradict or impeach it[9]then D.W. and D.S. must have been either siblings or cousins, and there is no evidence at all that they were cousins. The record is likewise devoid of any testimony or other evidence tending to show, or even suggest, that someone other than Mr. Berry is the father either of D.W. or of D.S.[10] Further, as previously noted, all reasonable inferences must be drawn in the District's favor, and it was not irrational for the trial judge to construe and assess Mr. Berry's statement of uncertainty as she evidently did. In particular, on this record, the judge could reasonably find to be minimal the possibility that all of the witnesses who testified that D.W. and D.S. are siblings were mistaken in their belief.
Although this court has not heretofore addressed the nature of the proof *1170 required in prosecutions or delinquency proceedings for incest, courts of other jurisdictions have held that the testimony of relatives alone, if credited by the trier of fact, is sufficient to prove this offense. See, e.g., Lusby v. State, 217 Md. 191, 141 A.2d 893, 896 (1958) ("The testimony of the prosecutrix to the effect that the defendant was her father was sufficient proof of her pedigraic status")[11]; Williams v. State, 284 Ga.App. 255, 643 S.E.2d 749, 752 (2007) ("The jury could also reasonably conclude from testimony by the victim and her siblings that Williams was the biological and/or legal father of them all. The evidence sufficed to sustain Williams's conviction for incest as well.")[12] "It has been held proper, where the evidence is otherwise competent, for one to testify to facts of family history which relate to him, such as the identity of his parents, or other relations." Lusby, 141 A.2d at 896 (quoting 31 C.J.S., Evidence, § 226(b)). Moreover, the District contends, and we agree, that "this testimony must be sufficient because we have had blood and DNA tests for comparatively few years, but there have been prosecutions of incest cases for centuries." Relying on 4 WILLIAM BLACKSTONE, Commentaries on the Laws of England 64, the District points out that incest was made a capital crime in 1650.[13] Because *1171 a family member is competent to testify concerning whether a particular person is his or her relative, it is necessarily the function of the trier of fact to assess each witness' credibility and to determine whether the witness has knowledge of the relevant facts. Moreover, we have held in several other contexts that even where scientific evidence could have been introduced, proof by testimonial or circumstantial evidence is sufficient to demonstrate guilt beyond a reasonable doubt. See, e.g., Bernard v. United States, 575 A.2d 1191, 1195 n. 5 (D.C.1990); Harris v. District of Columbia, 601 A.2d 21, 24-27 (D.C.1991); Derosiers v. District of Columbia, 19 A.3d 796, 800-01 (D.C.2011).[14]
The Supreme Court of Nebraska explained the applicable principles well 128 years ago, long before the advent of genetic tests:
It is certainly competent for one who, from his earliest recollection, has been a member of one's family, given his name, and reared in the belief, and in all ways given to understand that he is a son in the household, to testify of his parentage. His testimony may not be satisfactory or conclusive of the fact, but it is at least admissible for what it is worth in the minds of the jury, and clearly sufficient to make prima facie case, thus throwing the burden of overcoming it upon him who controverts it.
Comstock v. State, 14 Neb. 205, 15 N.W. 355, 356 (1883); accord, Lusby, 141 A.2d at 896 (quoting Comstock). Indeed, D.W. has cited no authority to the contrary, and we are aware of none. The record before us contains no evidence "controvert[ing]" or "overcoming," Comstock, 15 N.W. at 356, Lusby, 141 A.2d at 896, the District's presentation, at the very least, of a strong prima facie case.
It is true that in this very proceeding, the District introduced the results of genetic testing to prove conclusively that D.W. is the father of the baby boy born to D.S. If the District had presented similar evidence to show that Mr. Berry is the father of both D.W. and D.S., its case would have been stronger, the contradictions in the record with regard to how many children Mr. Berry has would have been entirely beside the point, and reasonable appellate judges would not now be disagreeing as to the sufficiency, even under our deferential standard of review, of the District's evidence of consanguinity. Nevertheless, we cannot say that the trial judge's decision lacks adequate support in the record. Accordingly, the judgment is
Affirmed.
SCHWELB, Senior Judge, concurring:
I join the opinion of the court, of which I am the author, but I think it appropriate to add a few observations which, in my view, provide some context to the controversy before us and may convey to the reader the atmospherics of the case.
At the evidentiary hearing, D.W.'s trial counsel, who represented her client conscientiously and resourcefully, devoted almost all of her efforts to defending the sexual abuse charge. She did not mention the incest count at all in her opening statement or closing argument, and her only reference to that count, in a transcript that exceeded 280 pages, consisted of sixteen lines in her oral MJOA. In presenting the defense case, counsel introduced no testimony *1172 or other evidence contesting the District's proof of incest.
Subsequently, in addressing the appropriate disposition of D.W.'s case and the conditions of probation, D.W.'s attorney not only failed to challenge the District's claim that D.W. and D.S. were [half-] siblings, but she effectively acknowledged that they were. Specifically, defense counsel represented to the court that D.S. had been "aware from the beginning of the statements made by his sister." Further, referring to Mr. Berry, who was present, D.W.'s attorney stated that "his father is here and can speak to [the issue of an appropriate curfew]."[1] At the time that counsel made these statements, she was well aware that, for purposes of the incest statute, a "sister" had to be a sister by blood. A "father," likewise, had to be the biological father.
The District has not argued that these statements by D.W.'s attorney were judicial admissionsindeed, neither party has mentioned them in its briefand I do not believe that such a contention would be sound. See Johnson v. District of Columbia Rental Hous. Comm'n, 642 A.2d 135, 138 (D.C.1994); IX WIGMORE ON EVIDENCE § 2588 (Chadbourn ed.1981). If the evidence of consanguinity had been insufficient without trial counsel's references to D.W.'s sister and father, these remarks would not have put the District over the top or changed the outcome of the case.
Nevertheless, counsel's description of D.S. as D.W.'s sister and of Mr. Berry as their father,[2] combined with the minimal attention accorded by the defense to the incest count, tend to reflect consciousness on the part of D.W.'s attorney that her defense as to that charge "is a weak and unfounded one" and, as we have recognized in a somewhat different context, "from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." Mills v. United States, 599 A.2d 775, 783 (D.C.1991) (quoting II WIGMORE ON EVIDENCE § 278, at 133 (Chadbourn ed.1979)). At the very least, these statements by D.W.'s attorney, her minimal focus on the incest charge, and her presentation of a witness (Mr. Jones) whose testimony effectively established the validity of that charge, provide reassurance that affirmance of the trial judge's adjudication of guilt did not result in a miscarriage of justice.[3]
*1173 Finally, a few words about the woman who was not there, i.e., on the witness stand. The one person who presumably knows for sure whether or not Mr. Berry is D.W.'s father is D.W.'s mother. She could thus have illuminated the controversy which is the subject of this appeal. Indeed, in all probability, she could have conclusively resolved it. So far as I can discern from the record, D.W.'s mother was available to testify. Indeed, there was some discussion of the possibility of placing D.W. in her home. Nevertheless, neither party called D.W.'s mother as a witness, although her testimony would obviously have helped one side or the other.[4]
If someone other than Mr. Berry is D.W.'s father, then it appears unlikely that D.W.'s conscientious and resourceful counsel would have failed to ascertain this potentially dispositive fact from her client's mother and to bring it to the attention of the court and opposing counsel. If such evidence was available, its presentation would probably have averted an adjudication of guilt of incest.
If, on the other hand, D.W.'s mother confirmed that Mr. Berry is the boy's father, the District could have required her to testify, but she might well have been a less than willing witness against her own young son. Given the rehabilitative purpose of juvenile proceedings and the availability of other witnesses against D.W., including D.W.'s own father,[5] counsel for the District could reasonably and understandably have declined to compel a mother to incriminate her own child.
In the final analysis, D.W.'s mother did not testify, and a silent record enables us to do no more than speculate as to what her testimony would have revealed as to D.W.'s paternity if she had taken the stand. For the reasons I have outlined, however, the fact that neither party called her as a witness does not warrant an inference against the District. On the contrary, if anything, her absence from the witness stand cuts the other way.
THOMPSON, Associate Judge, dissenting:
For several reasons, which I list below, I have found resolution of this appeal considerably more difficult than my colleagues have. In light of all the points that I discuss below, and with all due deference, I find myself unable to join in affirming the judgment of the trial court.
1. As Judge Schwelb's opinion recounts, during the government's case in chief, Donald Berry[1] testified, "I have not took [sic] a blood test, so I'm not positive that I'm the father, but, yes, I'm considered the father" of both D.W. and D.S. Perhaps on a different record, Mr. Berry's testimony could be read to mean only (as my colleagues suggest) that a man can never be absolutely certain that he is the *1174 father of a child without a blood test. But, in my view, the record afforded a reason for hesitation about that interpretation that rendered impossible anything approaching "near certitude"[2] that D.W. and D.S., with whom D.W. had sexual intercourse, are related by blood. During the government's case-in-chief, Mr. Berry testified that he has five children. Asked to give the names of his children, Mr. Berry named appellant D.W.; three other children who have the same mother as D.W.; and complainant D.S., who has a different mother (Keisha Simmons). The government's next witness was Ms. Simmons, who testified that Mr. Berry is the father of three of her six children, including D.S.[3] While Mr. Berry did list D.S. as one of his children when the prosecutor first asked about the matter, and while Ms. Simmons testified that Berry is the father of D.S., I believe their inconsistent testimony about whether he is the father of two of Ms. Simmons's other children, as she claimed, demanded that the trial court interpret Mr. Berry's statements that he is "not positive that [he is] the father" of D.S. and that he is "considered [her] father" as betraying some actual doubt about the matter.[4] Accordingly, I cannot agree with my colleagues that the record is "devoid of any testimony or other evidence tending to. . . even suggest []" that Mr. Berry was not "the father either of D.W. or of D.S." For much the same reason, I believe little weight can be accorded to the testimony of Willie Jones (purportedly the grandfather of both D.W. and D.S.) that D.S. is his granddaughter. The record provides no basis to doubt that he believes that he is D.S.'s grandfather, but his belief had even less probative value than Mr. Berry's statement about D.S.'s parentage. The issue is not Mr. Jones's or Mr. Berry's veracity, but instead the basis of their knowledge.
2. I believe (contrary to the view that Judge Schwelb expresses in his concurring opinion) that no weight could be accorded to the fact that D.W.'s counsel did not mention the incest charge in her opening or closing statement. Apparently, counsel was alerted to the issue of whether Mr. Berry is actually the father of both D.S. and D.W. by Mr. Berry's testimony during the government's case-in-chief that he is "not positive" that he is D.S.'s father but is "considered the father," and by the other discrepancies I have noted. See supra note 3. Defense counsel argued in her motion for judgment of acquittal that the government had failed to prove that D.S. and D.W. are related by consanguinity, and the court reserved its ruling until the trial was completed. In her closing argument, defense counsel asked the court to find D.W. not guilty "for the reasons stated in my previous motion." I believe the court clearly erred in "see[ing] no dispute on the issue of the charge of incest."
*1175 3. As appellant notes in his brief, no evidence was presented that Mr. Berry had been married at any time to, or had attempted to marry, either D.W.'s mother or D.S.'s mother, and thus the record afforded no basis for applying a statutory presumption that Mr. Berry is the father of any of their children. See D.C.Code § 16-909(a)(1)-(3). There also was no evidence that Mr. Berry, after having been given "written and oral notice of the alternatives to, legal consequences of, and the rights and responsibilities that arise from signing the acknowledgment,"[5] had acknowledged in writing that he is the father of either or both D.W. and D.S. Thus, the record afforded the trial court no basis for presuming paternity under D.C.Code § 16-909(a)(4) and (b-1)(2).
When a child has no "presumed parent" under the criteria set out in the foregoing provisions, a "conclusive presumption of parentage shall be created . . . [u]pon a result and an affidavit from a laboratory of a genetic test . . . indicating a 99% probability that the person is the genetic parent of the child." D.C.Code § 16-909(b-1)(1). Here, no genetic test results pertaining to D.S.'s or D.W.'s parentage were introduced.
When unrebutted, the presumptions described above can enable a litigant to prove paternity by a preponderance of the evidence. See D.C.Code § 16-909(a). These presumptions "are not a comprehensive statement of the universe of possibilities for proving parentage" by a preponderance of the evidence. In re Estate of Glover, 470 A.2d 743, 750 (D.C.1983) (citation and internal quotation marks omitted). But, when the issue of paternity had been raised and none of these presumptions was in play, the government's ability to prove paternity beyond a reasonable doubtthe standard that applied in D.W.'s trial surely was called into question.
4. The majority opinion notes that courts of other jurisdictions have held that the testimony of relatives alone is sufficient to prove the blood relationship necessary for incest, citing in particular Lusby v. State, 217 Md. 191, 141 A.2d 893 (1958).[6] For a couple of reasons, Lusby is of limited help in resolving the matter before us. First, while the Lusby court did state that "[t]he testimony of the prosecutrix to the effect that the defendant was her father was sufficient proof of her pedigraic status," id. at 896, the court also noted that this testimony was "not controverted." Id. at 897. Second, the court relied on case law holding that "[i]t is certainly competent for one who, from his earliest recollection, has been a member of one's family, given his name, and reared in the belief, and in all ways given to understand that he is a son in the household, to testify of his parentage" even though "[h]is testimony may not be satisfactory or conclusive of the fact."[7]Id. at 896 (quoting Comstock v. State, 14 Neb. 205, 15 N.W. 355, 356 (1883)).
5. To be sure, in numerous cases where the results of scientific testing would have *1176 been the best or most obvious way of proving an element of a crime, this court has held that the evidence was sufficient for conviction even in the absence of such scientific evidence. We have done so, for example, in cases involving driving while intoxicated or possession of an open container of alcohol, reasoning that police officers' observations of a defendant's demeanor, smell tests, and the like provided enough evidence to prove the charges beyond a reasonable doubt.[8] On the other hand, we have repeatedly implied that a conviction of possession or distribution of a controlled substance may require at least evidence of the results of a chemical screening test rendering it probable that the substance in question is indeed a controlled substance, and that other, circumstantial evidence tending to indicate the identity of a substance alone will not suffice.[9] However we might explain our somewhat disparate approaches in those two categories of cases, my observation is that neither category involves the same level of stigma that inheres in a charge of incest. As one recent law review article notes, "the very term `incest' is a powerful way to provoke an almost visceral disgust."[10] We have recognized that in administering juvenile justice, our courts should seek to avoid approaches that "may seriously impair the rehabilitative goals of the juvenile justice system" by "handicap[ping] the youths' prospects for adjustment in society and acceptance by the public." In re J.D.C., 594 A.2d 70, 76 (D.C.1991) (quoting Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 107-08, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (Rehnquist, J., concurring)). Given the stigma associated with incest, the potential for an incest adjudication to impair substantially a juvenile's prospects for adjustment and acceptance, and the "fluid and unsettled sense among the witnesses about who was related to whom" in this case, I believe we *1177 should be guided by the second category of cases, rather than the first, in resolving this appeal.
6. As already noted, "[t]he reasonable doubt standard of proof requires the factfinder to reach a subjective state of near certitude of the guilt of the accused." Rivas, 783 A.2d at 133 (citation and internal quotation marks omitted). This not merely is "a guideline for the trier of fact," but it also "furnishes a standard for judicial review of the sufficiency of the evidence." Id. at 134. It is true that our judicial review must be deferentiali.e., we must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "But this formulation does not mean that appellate review of sufficiency of the evidence is toothless." Id. (citation and internal quotation marks omitted). Instead, "[w]e have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that [the finder of fact] behaving rationally really could find it persuasive beyond a reasonable doubt." Id. "[I]f the evidence, when viewed in the light most favorable to the government, is such that a reasonable [fact-finder] must have a reasonable doubt as to the existence of any of the essential elements of the crime, then the evidence is insufficient and we must say so." Id. (citation, internal quotation marks, and emphasis omitted).
In this case, the government presented the results of DNA testing that confirmed that D.W. fathered the child to whom D.S. gave birth, but, as counsel confirmed at oral argument, that test did not establish that D.W. and D.S. are related by blood and no test to establish that (or to rule it out) was performed. To be sure, evidence was presented that individuals whom D.W. and D.S. know as father, mother, and grandfather consider the two to be siblings, and that D.W. and D.S. consider themselves to be siblings. The trial court also heard D.S.'s testimony that Mr. Berry named the son to whom D.S. gave birth, and that the child resides not with D.S. but with Mr. Berry. This can fairly be regarded as evidence of strong familial-like ties or affinity between Mr. Berry and D.S.[11] If the charge here had been attempted incestD.W.'s having had sexual relations with a girl he believed to be his sisterperhaps this omission would not matter. But on a charge that D.W. had sexual relations with a girl "related to [him] within . . . the fourth degree of consanguinity," D.C.Code § 22-1901, I would hold that the evidence presented in this case was not sufficient to prove the charge beyond a reasonable doubt. I therefore respectfully dissent.[12]
NOTES
[1] Jones is a not the grandfather's real name. We have substituted fictitious names for the actual names of the parents and grandfather of D.W. and D.S. in order to preserve and accord primacy to the children's anonymity. See D.C.Code § 16-2331 (2001); Super. Ct. Juv. R. 53(a); In re J.D.C., 594 A.2d 70, 75-76 (D.C.1991). We have elected not to use initials for the adults in order to minimize any confusion as to whom particular initials identify.
[2] The trial judge reserved her ruling on the single count of sexual abuse and requested additional briefing. She subsequently found D.W. not guilty of that charge. D.W. was placed on supervised probation for one year on the incest count.
[3] According to Ms. Simmons, "it should be like eight kids [Mr. Berry] has, including my three." (Id. at 27) Mr. Berry testified that he only has five children.
[4] D.W.'s mother was not called as a witness by either party.
[5] D.C.Code § 22-1901 (2001) provides:

If any person in the District related to another person within and not including the fourth degree of consanguinity, computed according to the rules of the Roman or civil law, shall marry or cohabit with or have sexual intercourse with such other so-related person, knowing him or her to be within said degree of relationship, the person so offending shall be deemed guilty of incest, and, on conviction thereof, shall be punished by imprisonment for not more than 12 years.
It is undisputed that this statute prohibits sexual intercourse between a half-brother and a half-sister.
[6] The analysis in a civil paternity proceeding involves significantly different considerations from those that apply here. The presumption of paternity under D.C.Code § 16-909.01 (2001) is a means of establishing the existence of a parent-child relationship and "all rights, privileges, duties, and obligations" therein. D.C.Code § 16-907. A common application of that presumption arises in a civil action to compel the payment of some monetary entitlement, such as child support, inheritance, or survivor's benefits. See, e.g., Matthews v. District of Columbia, 875 A.2d 650 (D.C.2005) (applying statutory presumption in suit by widow seeking survivor's benefits for child of decedent); In re Estate of Glover, 470 A.2d 743, 749 (D.C. 1983) (applying statutory presumption to permit child born out of wedlock to offer proof that decedent putative father is his parent). The purpose of the presumption, as the District explains in its brief, is to establish paternity where the father is either denying parentage or is otherwise unavailable to confirm it. The present appeal, which involves a father who has not denied but claimed parentage of the two children, does not implicate the principles governing paternity proceedings.
[7] Ms. Simmons, who is the mother of D.S., testified that Mr. Berry is her daughter's father. Both parents having confirmed that this is so, we do not believe that the trial judge's finding of a father-daughter relationship between Mr. Berry and D.S. can be second-guessed on appeal.
[8] According to our dissenting colleague, the record "afford[s] a reason for hesitation about that [i.e., the trial court's] interpretation," and this reason for hesitation "rendered impossible anything approaching [the] near certitude," Rivas, 783 A.2d at 133, which is required for a finding of guilt beyond a reasonable doubt. Post, at p. 1173. The question before us is not, however, whether a reason for hesitation exists. The court is not required "to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original) (citation omitted). Accordingly, we must decide whether under the foregoing standard, with due recognition of the superior opportunity of the trier of fact to assess credibility and to draw reasonable inferences, the judge's assessment of Mr. Berry's testimony, and her finding of guilt beyond a reasonable doubt, were clearly in error. See Rivas, 783 A.2d at 134; Blaize, 21 A.3d at 82.

Judge Thompson also points to the discrepancy, see supra n. 3, between Mr. Berry's account of how many children he has and the testimony of Ms. Simmons. An examination of this discrepancy reveals, however, that Mr. Berry does not admit paternity of children that Ms. Simmons attributes to him, and not that he falsely claims paternity where no such claim is warranted. Mr. Berry had no apparent motive to testify that D.W. was his son if this was untrue, since such a false claim would subject D.W. to unwarranted delinquency proceedings for incest.
[9] "The credibility of a witness may be attacked by any party, including the party calling the witness." D.C.Code § 14-102(a) (2001); see Sparks v. United States, 755 A.2d 394, 401 (D.C.2000); Smith v. United States, 26 A.3d 248, 261 (D.C.2011). Nevertheless, in the trial court, the defense did not suggest in any way that Mr. Jones was being untruthful, or that he had no basis of knowledge, regarding the children's relationship to him.
[10] There is no evidence in the record that the mothers of D.W. and D.S. might have been having sexual relations with men other than Mr. Berry at the time that these children were conceived. The trial judge was not obliged to credit such an unoffered explanation in the face of Mr. Berry's affirmative statement that both D.W. and D.S. are his children.
[11] The Lusby decision is more than half a century old, but it remains persuasive. Moreover, we have reiterated twice in the very recent past that decisions of the Court of Appeals of Maryland are "accorded the most respectful consideration by our courts." In re Estate of Turpin, 19 A.3d 801, 808 n. 11 (D.C.2011) (citing Roberts-Douglas v. Meares, 624 A.2d 405, 419 n. 20 (D.C. 1992)); English v. United States, 25 A.3d 46, 54 n. 11 (D.C. 2011). Although it is true that in Lusby, 141 A.2d at 897, the court described the victim's testimony that the defendant was her father as "uncontroverted," the same can fairly be said in this case; Mr. Berry testified that he was both children's father, and no witness testified to the contrary or claimed that anybody else was the father of either children.

Judge Thompson quotes a sentence in Tapscott v. State, 106 Md.App. 109, 664 A.2d 42, 52 (1995), aff'd as to different issue, 343 Md. 650, 684 A.2d 439 (1996), to the effect that in order "to prove the charge of incest, the State had to produce scientific facts about the relationship of the accused to the victim." In Tapscott, however, the prosecution had in fact introduced DNA evidence, and no question was presented as to whether the State's case would have been insufficient without such evidence. The intermediate appellate court in Tapscott could hardly have intended to overrule Lusby, a decision of Maryland's highest court.
Further, the sole question presented to the Maryland Court of Appeals in Tapscott was "whether half-blood relationships are included within Maryland's prohibition against incest." 684 A.2d at 440. The court answered that question in the affirmative, and its opinion had nothing at all to do with whether evidence of genetic testing is required in order to prove incest. We therefore cannot agree with the suggestion in footnote 6 to the dissent that the decision of Maryland's highest court in Tapscott somehow undercuts Lusby or is "notabl[e]" in relation to the issue of evidentiary sufficiency now before us.
[12] See also Sargent v. State, 875 N.E.2d 762, 767 (Ind.Ct.App.2007) ("The State presented sufficient evidence to establish that Sargent committed [two counts of incest]. T.S. and Sargent both testified that T.S. was Sargent's daughter."); State v. Sockbeson, 430 A.2d 1105, 1106 (Me.1981) ("[T]he child's statement that the defendant was her father and the defendant's admission that she was his daughter were sufficient to prove their relationship and sustain a conviction of incest.").
[13] Our dissenting colleague suggests that at least on this record, scientific proof of consanguinity should be required, in part because of the high "level of stigma" and "almost disgust" generated by allegations of incest. As we have explained in note 1, supra, the law preserves and accords primacy to the anonymity of juveniles in D.W.'s circumstances, and we have also disguised the names of D.W.'s relatives in order to further that goal. In any event, we are of the opinion that any question whether the nature of incest is such that more (or different) proof must be presented in prosecutions for that crime than in other cases is appropriately addressed to the legislature.
[14] We do not believe that any of the decisions described in footnote 9 of the dissenting opinion supports the proposition that the District's evidence of consanguinity in this case was insufficient as a matter of law.
[1] As noted in the opinion of the court, the defense also called Mr. Jones as a witness on D.W.'s behalf. When Mr. Jones testified that D.W. and D.S. are his grandchildren, counsel made no attempt to impeach him, to question or cast doubt on his testimony, or to suggest that he might not know the children's true ancestry. On appeal, however, D.W.'s attorneys claim for the first time that Mr. Jones did not and could not know whether his testimony on this subject was true. "[C]ourts do not look with favor on abrupt reversals of direction by litigants as they proceed from one court to the next." District of Columbia v. Wical Ltd. P'ship, 630 A.2d 174, 182 (D.C. 1993).
[2] By orally moving for a judgment of acquittal of the incest count, the defense preserved the issue of the sufficiency of the evidence, and I do not suggest the contrary. However, if D.W.'s obviously able attorney had considered consanguinity to be a seriously contested issue, she could simply have referred to statements "made by D.S." rather than "by [D.W.'s] sister," and she could have said that "Mr. Berry is here," rather than that "[D.W.'s] father is here."
[3] I emphasize that nothing in this concurring opinion should be construed as criticizing what the record discloses to have been the first-rate defense of D.W. by his trial attorney. In my view, counsel took the necessary steps to preserve the sufficiency issue and, having done so, and having avoided making any judicial admission, implicitly acknowledged what she apparently and understandably regarded as undeniable.
[4] Neither the District nor the defense sought to invoke the "missing witness" doctrine. See Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893). Because the witness apparently was not "peculiarly available" to either party, I agree that this doctrine is not in play, even though for the reasons explained below, if Mr. Berry is not D.W.'s father, then the circumstances here arguably "make it reasonable to expect [the defense] to have called [D.W.'s mother as] a witness." Strong v. United States, 665 A.2d 194, 197 (D.C.1995).
[5] Mr. Berry was, of course, the father of the complainant, D.S., as well as of her alleged assailant, D.W., and therefore any potential paternal loyalty on this part was owed to each of them.
[1] I follow the majority opinion's approach of using fictitious names to preserve the anonymity of the juveniles involved in this case. See ante, note 1. I also use the fictitious names that Judge Schwelb has chosen.
[2] Rivas v. United States, 783 A.2d 125, 133 (D.C.2001) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
[3] The discrepancies did not end there. Mr. Berry testified that he has a total of five children, but Ms. Simmons testified that Mr. Berry has eight children, including three with Ms. Simmons. Ms. Simmons testified that she has six children, including D.S.; but, asked to name her mother's children, D.S. gave the names of seven children. As appellant argues, these inconsistencies "showed a fluid and unsettled sense among the witnesses about who was related to whom and how, and cast doubt on the accuracy of the witnesses' assessment of" the biological relationships.
[4] As appellant points out, no evidence was presented about the status of Mr. Berry's relationship with Ms. Simmons at the time D.S. was conceived, or about any relationship(s) Ms. Simmons might have had with any other man around that time.
[5] D.C.Code § 16-909.01(a)(1).
[6] Notably, thirty-eight years after Lusby, the Maryland Court of Appeals affirmed the decision in Tapscott v. State, 106 Md.App. 109, 664 A.2d 42 (1995), aff'd, 343 Md. 650, 684 A.2d 439 (1996), in which the Court of Special Appeals of Maryland stated (albeit in dictum) that "[t]o prove the charges of incest, the State had to produce scientific facts about the relationship of the accused to the victim." Id. at 52.
[7] Here, by contrast, neither D.W. nor D.S. bears Mr. Berry's (or Mr. Jones's) surname, and neither child resided with Mr. Berry. At the time of the charged offense, D.W. lived with Mr. Jones, while D.S. lived with Ms. Simmons.
[8] See, e.g., Derosiers v. District of Columbia, 19 A.3d 796, 799-800 (D.C.2011) ("District of Columbia courts have accepted as proof the judgment of police officers who testified, based on their experience and good-faith sensory observations, as to the identity of an allegedly alcoholic beverage."); Harris v. District of Columbia, 601 A.2d 21, 24, 26-27 (D.C.1991) (explaining that "[a] conviction for driving under the influence . . . can be supported by an accumulation of evidence other than a [blood alcohol] test . . . e.g., evidence of erratic driving by the accused, slurred speech, [or] odor of alcohol on the breath" and testimony of "lay witnesses, including police officers,. . . [that] the driver of a vehicle appeared to be under the influence of alcohol") (citation and internal quotation marks omitted).
[9] See, e.g., Washington v. United States, 965 A.2d 35, 42, 43 (D.C.2009) (noting that "the DEA-7 reports [admitted in violation of defendant's confrontation rights] alone supplied th[e] essential proof" that what defendant distributed or possessed "was a controlled substance, namely cocaine or a mixture containing cocaine, in a measurable amount," but that "[t]he government presented ample credible evidence, independent of the chemist's reports, to prove the elements [of attempted possession and distribution of crack cocaine]"); Hill v. United States, 541 A.2d 1285, 1288 (D.C.1988) (explaining that identification testimony of a single eyewitness is sufficient to sustain a conviction of distributing a controlled substance, "coupled, of course, with other evidence identifying the substance itself"); Moore v. United States, 374 A.2d 299, 302 (D.C. 1977) (reasoning that the government analyst's screening test for marijuana, together with "other facts which particularize and support the opinion of the expertnamely, the general appearance of the substance in the one bag, and its presence in the form of cigarette butts in the other," was sufficient to establish beyond a reasonable doubt that appellant possessed marijuana) (citation and internal quotation marks omitted).
[10] Courtney Megan Cahill, Same-Sex Marriage, Slippery Slope Rhetoric, and the Politics of Disgust: A Critical Perspective on Contemporary Family Discourse and the Incest Taboo, 99 Nw. U.L.REV. 1543, 1546 (2005).
[11] In some jurisdictions, the statute criminalizing incest prohibits sexual relations between persons who are related by blood or affinity. See, e.g., United States v. Dunn, 267 Fed.Appx. 429, 431-32 (6th Cir.2008) (citing Mich. Comp. Laws Ann. § 750.520d (1)(d) (2003)). Our statute, D.C.Code § 22-1901, does not proscribe conduct between individuals related only by affinity.
[12] I recognize that, unlike this Division, the trial judge "had a front-row seat as the testimony unfolded." Combs v. District of Columbia Dept. of Employment Services, 983 A.2d 1004, 1010 n. 3 (D.C.2009) (citation omitted). In particular, the trial judge had an opportunity to see Mr. Berry, D.S., and D.W. I have considered the possibility that the trial judge might have observed, for example, that D.S. and D.W. are both the "spitting image" of Mr. Berry (an observation of a type that courts have admitted as evidence that a child is the biological child of a man). See, e.g., Jones v. Eley, 256 Va. 198, 501 S.E.2d 405, 406 (1998). However, if the trial judge had that perception, she made no mention of it, and the record contains no evidence on this point.