*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-1074

BERNARD J. FLEMING, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-1328-14)

(Hon. Robert E. Morin, Trial Judge)

(Argued En Banc January 11, 2018            Decided January 30, 2020)

*Peter H. Meyers* for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *S. Vinet Bryant*, and *Kathryn L. Rakoczy*, Assistant United States Attorneys, were on the brief, for appellee.

*Daniel Gonen*, with whom *Samia Fam*, *Alice Wang*, and *Joshua Deahl* were on the brief, for Public Defender Service, *amicus curiae*.

*Mark S. Davies* was on the brief for Deonte J. Bryant, *amicus curiae*.

*Jessica Ring Amunson* and *Michael E. Stewart* were on the brief for Terrance M. Bush, *amicus curiae*.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN, FISHER, THOMPSON, BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

Opinion for the court by *Associate Judge* MCLEESE, joined by BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN, FISHER, and THOMPSON, *Associate Judges*.

Concurring opinion by *Associate Judge* FISHER, joined by *Associate Judge* THOMPSON, at page 38.

Opinion concurring in the judgment by *Associate Judge* EASTERLY, joined by *Associate Judge* BECKWITH, at page 42.

MCLEESE, *Associate Judge*:  Appellant Bernard Fleming challenges his conviction for second-degree murder while armed, arguing that the jury was erroneously instructed about how to determine whether Mr. Fleming and his codefendant were responsible for causing the death at issue.  In instructing the jury, the trial court in this case relied on this court's decision in *Roy v. United States*, 871 A.2d 498 (D.C. 2005), which addressed the issue of homicide causation in the context of a "gun battle," *id.* at 505-09.  A division of the court affirmed Mr. Fleming's conviction, *Fleming v. United States*, 148 A.3d 1175 (D.C. 2016), but the full court decided to reconsider *Roy* in light of the Supreme Court's subsequent decision in *Burrage v. United States*, 571 U.S. 204 (2014).  *Fleming v. United States*, 164 A.3d 72 (D.C. 2017).  In light of *Burrage*, we hold that the instructions given in *Roy* and in this case did not adequately convey to the jury the requirement that -- possibly barring unusual circumstances not present in this case -- a defendant cannot be held to have personally caused a death unless an action by the defendant is a but-

for cause of the death, i.e., unless it is true that in the absence of the defendant's action the death would not have occurred. We therefore reverse Mr. Fleming's conviction for second-degree murder while armed and remand for further proceedings. Mr. Fleming raises a variety of other challenges to the causation instruction in this case, and we address those challenges to the extent that they might affect proceedings on remand.

## I.

The opinion for the division described the evidence at trial, *Fleming*, 148 A.3d at 1178-79, and we borrow freely from that description here. Michael Jones was shot and killed during a gunfight. The shooting was the culmination of events that began with a confrontation earlier the same evening between Mr. Fleming and Michael Jones's brother, Maurice Jones. *Id.* at 1178. (To avoid confusion we occasionally refer to Michael and Maurice Jones using their first names.)

On the evening at issue, Maurice left his apartment to walk to a nearby store. On the way there, Maurice encountered Mr. Fleming, who was with two other men. Mr. Fleming taunted Maurice and struck him on the chin. Being outnumbered, Maurice retreated to his apartment. *Fleming*, 148 A.3d at 1178.

About half an hour later, Maurice heard banging on his front door and several voices outside. He ignored the banging and did not open the door. After the banging stopped, Maurice looked out and saw Mr. Fleming waiting with Joseph Peoples and Rakeem McMillan. Maurice phoned his brother Michael and a friend named Eric Cunningham and asked them to come to his apartment. While he waited for them, Maurice looked outside from time to time and saw Mr. Fleming and Mr. Peoples gesture for him to come out. After a while, Mr. Fleming and his companions departed. *Fleming*, 148 A.3d at 1178.

Not long afterward, Michael and Mr. Cunningham arrived at Maurice's apartment, together with a friend of Michael's named James Hamlin. The four men then left on foot to look for Mr. Fleming. About a block away, Maurice spotted Mr. Peoples rapidly descending the exterior stairway of the Lincoln Tower apartment building. Maurice called to Mr. Peoples, but Mr. Peoples ignored Maurice and crossed the street to join Mr. McMillan. Moments later, according to Maurice, Mr. Peoples turned and began shooting at him and his three companions as they arrived at Lincoln Tower. *Fleming*, 148 A.3d at 1178-79.

Michael drew a gun and fired back at Mr. Peoples, but Michael then was killed by a bullet that struck him in the back of the head. Mr. Hamlin also fired a gun in response to the attack. Shell casings from two different weapons were found near Michael's body. *Fleming*, 148 A.3d at 1179.

Other shell casings recovered from the scene indicated that shots also were fired from a second-floor balcony of Lincoln Tower. Video-surveillance footage from inside Lincoln Tower shows Mr. Fleming on that balcony during the shooting. The surveillance footage also appears to show Mr. Fleming retrieving what could have been a weapon from inside the building and bringing it to the balcony just before the shooting started. Footage from just after the shooting apparently shows Mr. Fleming hurrying to the sixth floor and meeting with Mr. Peoples. Mr. Peoples appears to receive something from Mr. Fleming that Mr. Peoples then stashes in a stairwell. The police recovered firearms from that location. Relying on this evidence, the United States contended at trial that Mr. Fleming armed himself after seeing Maurice and company arrive at Lincoln Tower, shot at them from the balcony, and then, after Michael was down and the battle ended, handed his gun to Mr. Peoples, who hid it in the stairwell. *Fleming*, 148 A.3d at 1179.

Because the bullet that struck Michael fragmented, it was not possible to tell whether that bullet was fired by Mr. Fleming, Mr. Peoples, or Mr. Hamlin. *Fleming*, 148 A.3d at 1179.

## II.

The United States presented three distinct theories of Mr. Fleming's liability at trial. First, if Mr. Fleming fired the fatal bullet, then he could be found guilty as a principal. Second, if Mr. Peoples fired the fatal bullet, then Mr. Fleming could be found guilty as an aider and abettor. But the evidence left open a third scenario: that Mr. Hamlin inadvertently shot Michael. The United States conceded at trial that Mr. Fleming could not be considered as having aided and abetted Mr. Hamlin, and we therefore have no occasion to address that issue. Rather, to address the possibility that Mr. Hamlin shot Michael, the United States relied on a causation theory. The second-degree-murder instruction required that the jury find that the defendant "caused the death of Michael Jones" and that, "at the time he did so," the defendant "intended to kill or seriously injure" or "acted in conscious disregard of an extreme risk of death or serious bodily injury." The jury was further instructed that "[a] person causes the death of another person if his conduct is a substantial factor in bringing about the death and if it was reasonably foreseeable that death or serious

bodily injury could result from such conduct." Finally, the jury was given a "gun battle" causation instruction based on this court's decision in *Roy*. Specifically, the trial court instructed the jury that a defendant should be deemed to have caused Michael's death if (1) the defendant was armed and prepared to engage in a gun battle; (2) the defendant in fact engaged in a gun battle; (3) the defendant's conduct was a substantial factor in the death of Michael Jones; (4) it was reasonably foreseeable that death or serious bodily injury could occur as a result of the defendant's conduct during the gun battle; and (5) the defendant did not act in self-defense.

Mr. Fleming, supported by several amici, raises a number of objections to the causation instructions in this case. In opposing the petition for rehearing en banc and in its brief to the en banc court, the United States contends that Mr. Fleming did not properly preserve one of those objections in briefing before the division: the argument that the court should overrule *Roy*. We are not persuaded by the United States's contention. A division of the court cannot overrule a prior decision of the court. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). It is difficult to see why a litigant should be required to present an argument to a division of the court that the division of the court would be required to reject. *Cf. District of Columbia Hous. Auth. v. District of Columbia Office of Human Rights*, 881 A.2d 600, 613 n.18 (D.C.

2005) (failure to object before agency perhaps may be excused in rare circumstance in which "it truly and clearly would have been futile to raise the claim in the agency venue"). The United States cites no case holding that a litigant is required to present to a division of the court the argument that a prior holding of the court should be overruled, and we are aware of no such case. We therefore consider Mr. Fleming's contention that this court should overrule *Roy*. At oral argument, the United States for the first time suggested that other of Mr. Fleming's arguments were not properly preserved in the trial court. We are not inclined to consider the United States's belated issue-preservation argument. *See, e.g.*, *In re T.L.*, 859 A.2d 1087, 1090 n.6 (D.C. 2004) (District of Columbia failed to properly preserve on appeal argument that appellant failed to properly preserve argument in trial court).

In this opinion, we address issues of law that we decide de novo: how to interpret the second-degree-murder statute and whether the instructions to the jury in this case adequately communicated the applicable legal principles. *See, e.g.*, *Briscoe v. United States*, 181 A.3d 651, 655 (D.C. 2018) ("Our review of questions of statutory interpretation is de novo."); *Buskey v. United States*, 148 A.3d 1193, 1205 (D.C. 2016) (court reviews de novo whether instruction correctly stated elements of theory of liability). The United States appears to suggest that we should review only for abuse of discretion when assessing the adequacy of the instructions

in this case. Although our terminology has not always been entirely clear on this point, we review de novo whether challenged jury instructions adequately state the law. *See, e.g.*, *Brown v. United States*, 139 A.3d 870, 875 (D.C. 2016) ("The question whether the challenged instruction was proper is one of law. Accordingly, our review is *de novo*, and we accord no deference to the ruling of the trial court.") (ellipsis omitted; quoting *Wilson-Bey v. United States*, 903 A.2d 818, 827 (D.C. 2006) (en banc)); *cf., e.g.*, *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017) (abuse of discretion may be found if trial court gives jury instructions that "as a whole do[] not fairly and accurately state the applicable law") (internal quotation marks omitted); *Pannu v. Jacobson*, 909 A.2d 178, 198 (D.C. 2006) ("[I]t is incumbent on the trial court to properly instruct the jury on the law. . . . [T]he trial court must give the jury an accurate and fair statement of the law.").

**III.**

The second-degree-murder statute, which was enacted by Congress in 1901, makes it a crime to "kill[] another" "with malice aforethought." D.C. Code § 22-2103 (2012 Repl.); *see* An Act to Establish a Code of Law for the District of Columbia, 31 Stat. 1321, ch. 19, § 800 (1901). Although second-degree murder is "defined by statute, [that] statute[] embod[ies] the common law definition of

murder." *Comber v. United States*, 584 A.2d 26, 38 n.9 (D.C. 1990) (en banc) (citation omitted).

In stating the elements of murder, this court has frequently expressed the requirement that the defendant have "kill[ed] another" as a requirement that the defendant have "caused the death of" another. *See, e.g.*, *Williams v. United States*, 52 A.3d 25, 31 (D.C. 2012) (elements of second-degree murder include that defendant "caused the death of the victim"); *Robinson v. United States*, 946 A.2d 334, 339 (D.C. 2008) (same as to first-degree felony murder); *Williams v. United States*, 858 A.2d 984, 1001 (D.C. 2004) (same as to first-degree premeditated murder). That approach is consistent with standard common-language and legal definitions of the word "kill." *See, e.g.*, *Webster's Third New International Dictionary* 1242 (2002) (first definition of "kill" is "to deprive of life : put to death : cause the death of"); *Black's Law Dictionary* 1002 (10th ed. 2014) (defining "kill" as "[t]o end life; to cause physical death"). That approach is also consistent with descriptions of the law of homicide from many commentators, reaching far into the past. *See, e.g.*, *Model Penal Code* §§ 210.1 & .2 (murder requires proof that defendant "cause[d] the death of another") (Am. Law Inst. 1985); 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.1(f), at 582 (2d ed. 2018) (murder requires proof that defendant was "legal[] cause" of death) (internal quotation marks

omitted); 2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 636 (Boston, Little, Brown & Co. 6th ed. 1877) ("[A]s a general proposition, he whose act causes, in any way, directly or indirectly, the death of another, kills him, within the meaning of the law of felonious homicide."); 4 William Blackstone, *Commentaries* \*196-97 ("The killing may be by poisoning, striking, starving, drowning, and a thousand other forms of death, by which human nature may be overcome. . . . If a man however does such an act, of which the probable consequence may be, and eventually is, death[,] such killing may be murder, although no stroke be struck by himself . . . ."). These considerations strongly support interpreting "kill" to mean "cause death." *See, e.g.*, *Carrell v. United States*, 165 A.3d 314, 319 n.12 (D.C. 2017) (en banc) ("It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.") (internal quotation marks omitted); *Shipkey v. District of Columbia Dep't of Emp't Servs.*, 955 A.2d 718, 726-27 (D.C. 2008) ("Dictionaries provide a useful starting point to determine what statutory terms mean[.] [L]ikewise when a popular or common word is used in a statute, but is not defined, the word should be given its common meaning.") (brackets, ellipses, and internal quotation marks omitted).

Mr. Fleming points out that in several cases this court has used a different formulation of the requirement that the defendant killed another: that the defendant "inflicted injury on the decedent from which [the decedent] died." *Waller v. United States*, 389 A.2d 801, 807 (D.C. 1978). It is not entirely clear what that formulation means. If the formulation is meant to foreclose homicide liability whenever the action of someone other than the defendant more directly inflicts the fatal physical injury on the decedent, then the formulation is contrary not only to the considerations already noted but also to the holdings of several of our cases. *See, e.g.*, *Blaize v. United States*, 21 A.3d 78, 79-83 (D.C. 2011) (defendant guilty of voluntary manslaughter where defendant shot towards victim, who fled into street and was fatally struck by car driven by third party); *Bonhart v. United States*, 691 A.2d 160, 162-64 (D.C. 1997) (arsonist who set fire to building guilty of felony murder even if occupant had initially escaped building but died after reentering to save dog); *McKinnon v. United States*, 550 A.2d 915, 916-19 (D.C. 1988) (defendant guilty of first-degree premeditated murder where defendant slashed victim's throat, doctors were able to treat victim's wounds, victim was discharged from hospital, but victim later died from hepatitis most likely caused either by blood transfusions or by drug therapy). We therefore take this occasion to clarify that, for purposes of the District of Columbia's homicide statutes, "kill" means "cause death."

**IV.**

We next consider what it means to cause death for purposes of the second-degree-murder statute. The concept of causation arises in many areas of law. H.L.A. Hart & Tony Honoré, *Causation in the Law* 84 (2d ed. 1985) ("Causal questions . . . appear in every branch of the law and there is a variety of ways, even in a single branch, in which legal rules make causal connection an element in responsibility."). Our cases have used varying terminology in discussing causation requirements in various settings, and we do not in this case attempt to formulate a general theory of causation cutting across all areas of the law. Rather, we limit our holding to the context of the statute we have before us, although some of our reasoning may have implications that run beyond that statute.

In addressing the causation issue in this case, we have the benefit of the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 204 (2014). The Public Defender Service (PDS) as amicus curiae argues that *Burrage*, which involved the federal Controlled Substances Act, directly binds us in the interpretation of the congressionally enacted second-degree-murder statute. We need not resolve that argument, however, because we find *Burrage* persuasive with respect to the issues that we decide in this case.

## A.

*Burrage* provides a useful general framework for our analysis:

> The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause. When a crime requires not merely conduct but also a specified result of conduct, a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called the proximate cause) of the result.

571 U.S. at 210 (citation and internal quotation marks omitted). Within that framework, we turn first to the first requirement: actual causation. As the Supreme Court explained in *Burrage*, actual causation "[i]n the usual course . . . requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." 571 U.S. at 211 (internal quotation marks omitted). In the context of second-degree murder (and leaving aside for now potential complexities arising from concepts of aiding and abetting and coconspirator liability), the actual-cause requirement means that the United States must prove that, if one subtracted the defendant's actions from the chain of events, the decedent would not have been killed.

In *Burrage*, the United States argued that "but-for" causation should not be required under the statute there at issue, which imposed heightened penalties where death or serious bodily injury "results from" drug distribution. 571 U.S. at 214-19. The Supreme Court was not persuaded by the United States's arguments. *Id.* In the present case, by contrast, the United States acquiesces in the conclusion that but-for causation is required under the second-degree-murder statute. We agree with the United States's acquiescence in the application of *Burrage*'s but-for causation requirement to second-degree murder. The Supreme Court gave seven main reasons for requiring but-for causation: (1) but-for causation is part of the traditional understanding of the concept of cause, *id.* at 210-13; (2) courts applying statutes with causal language have generally required but-for causation, in the absence of "textual or contextual indication to the contrary," *id.* at 212; (3) ordinary language supports imposing a but-for causation requirement, *id.* at 210-12; (4) state courts interpreting criminal laws with causal language usually require but-for causation, *id.* at 213-14; (5) the alternative approach to actual causation advocated by the United States in *Burrage* -- that the conduct at issue be a "substantial" or "contributing" factor -- finds less support in the case law, *id.* at 215; (6) it is unclear how to apply the "substantial" or "contributing" factor approach, *id.* at 217-18; and (7) the rule of lenity precludes giving the statutory "text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant," *id.* at 216. In our

view, similar reasons justify requiring but-for causation in the context of second-degree murder.

We pause briefly to flag three points. First, in theory one could argue that a defendant's conduct can never be a but-for cause of a decedent's death, because the decedent, being mortal, would always eventually have died even in the absence of the defendant's conduct. It is well understood, however, that a defendant's conduct that hastens the decedent's death is a but-for cause of death. *See, e.g.*, 1 LaFave § 6.4(b), at 636 ("[O]ne who hastens the victim's death is a cause of his death."). Second, there may be exceptions to the general requirement of but-for causation, for example in the "rare" situation in which "multiple sufficient causes independently, but concurrently, produce a result." *Burrage*, 571 U.S. at 214-15. The Supreme Court describes such a rare situation in *Burrage*: two people independently shoot and stab the victim at the same time, with each act being sufficient to cause death in the absence of the other. *Id.* at 215. As in *Burrage*, however, we need not address such possible exceptions, because the United States has not argued that the present case falls within such an exception. Third, more complicated issues can arise from the interaction between the requirement of but-for causation and concepts of vicarious liability, such as aiding and abetting and coconspirator liability. *See generally Dickens v. United States*, 163 A.3d 804, 810 (D.C. 2017) ("The elements

of aiding and abetting are that (1) a crime was committed by someone, (2) the accused assisted or participated in its commission, and (3) [the accused's] participation was with guilty knowledge.") (brackets and internal quotation marks omitted); *Richardson v. United States*, 116 A.3d 434, 442 (D.C. 2015) ("[A] co-conspirator who does not directly commit a substantive offense may nevertheless be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement.") (brackets and internal quotation marks omitted).  Thus, a defendant whose actions are not a but-for cause of death can nevertheless be guilty of homicide.  For example, consider a defendant who takes actions -- such as shooting at the decedent but missing -- intending to help the principal kill the decedent.  That defendant can be guilty of murder as an aider and abettor even if the principal's actions alone would have killed the decedent.  *See, e.g.*, *Gillis v. United States*, 586 A.2d 726, 728 (D.C. 1991) (per curiam) (where defendant acted in concert with other shooters, defendant could be found guilty as aider and abettor even if defendant was not personally responsible for shooting given victim); *see generally* 2 LaFave § 13.2(a), at 464 & n.55 ("The assistance given [by accomplice] need not contribute to the criminal result in the sense that but for it the result would not have ensued.") (quoting *State ex rel. Martin v. Tally*, 15 So. 722, 738 (Ala. 1894) (ellipsis omitted)); *People v. Franzen*, 148 Cal. Rptr. 3d 863, 880 (Ct. App. 2012)

("But while the [aider and abettor] must in fact assist the primary actor to commit the offense, there is no requirement that [the aider and abettor's] conduct be a but-for cause or even an essential factor in bringing it about.") (brackets and internal quotation marks omitted).

The jury in this case was not explicitly instructed that it was required to find but-for causation. Rather, as previously noted, the jury was instructed, based on our decision in *Roy*, that the jury could find Mr. Fleming to have caused Michael Jones's death if (1) Mr. Fleming was armed and prepared to engage in a gun battle; (2) Mr. Fleming did engage in a gun battle; (3) Mr. Fleming's conduct "was a substantial factor in the death of Michael Jones;" (4) it was reasonably foreseeable that death or serious bodily injury could occur as a result of Mr. Fleming's conduct during the gun battle; and (5) Mr. Fleming did not act in self-defense. The United States argues that this instruction in substance required the jury to find but-for causation. We disagree. For example, assume that the jury found that Mr. Fleming participated in the gun battle solely by shooting his gun once, after the first shots had been fired but just before Michael Jones was shot and killed. Assume also that the jury believed that it was quite possible that Mr. Hamlin inadvertently shot Michael Jones and that once the first shots were fired Mr. Hamlin very likely would have fired back and Michael Jones very likely would have been killed, even if Mr. Fleming had never

fired his gun. On those conclusions, the jury could have found that Mr. Fleming was armed and prepared to engage in a gun battle, that he did engage in a gun battle, that death was reasonably foreseeable, and that Mr. Fleming did not act in self-defense. The jury could also have found that Mr. Fleming's firing of his gun was a substantial factor in Michael's Jones's death, particularly because the jury was given no guidance about how significant a factor Mr. Fleming's conduct would have to be in order to qualify as substantial. *Cf. Burrage*, 571 U.S. at 218 (uncertainty about meaning of term "substantial" "cannot be squared with the beyond-a-reasonable-doubt standard applicable in criminal trials or with the need to express criminal laws in terms ordinary persons can comprehend"). But the jury could not on those conclusions reasonably find beyond a reasonable doubt that Mr. Fleming's firing of the gun was by itself a but-for cause of Michael Jones's death.

In sum, the requirement that Mr. Fleming's conduct have been a substantial factor in Michael Jones's death is not remotely equivalent to a requirement of but-for causation. To the contrary, the United States argued in favor of a substantial-factor test in *Burrage* precisely because that test is in important respects less stringent than a requirement of but-for causation. 571 U.S. at 213-18.

The trial court in this case understandably instructed the jury based on the substantial-factor approach this court approved in *Roy*, 871 A.2d at 506-09. In light of the Supreme Court's subsequent decision in *Burrage*, however, we conclude that the causation instructions in *Roy* and in this case did not "fairly and accurately state the applicable law." *Whitt*, 157 A.3d at 202 (internal quotation marks omitted). The United States has not argued that this error was harmless, and we are doubtful that such an argument could have succeeded had it been made. We therefore vacate Mr. Fleming's conviction for second-degree murder while armed and remand for further proceedings. (We note that we do not address whether the evidence was sufficient to support Mr. Fleming's conviction for second-degree murder, because Mr. Fleming has never raised that issue.)

**B.**

Although we have already determined that Mr. Fleming's conviction for second-degree murder while armed must be vacated, Mr. Fleming and the amici raise a number of additional challenges to the causation instructions given in this case. We address several of those challenges because they could arise on remand. *See generally, e.g.*, *District of Columbia v. Dep't of Emp't Servs.*, 713 A.2d 933, 936

(D.C. 1998) ("Since a remand is necessary, we deem it appropriate to address certain issues that are likely to arise on remand.").

**1.**

Mr. Fleming and the amici also rely heavily on the second required component of the causation inquiry: proximate cause. Proximate cause "defies easy summary." *Paroline v. United States*, 572 U.S. 434, 444 (2014). Speaking generally, "to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." *Id.* Proximate cause

> generally refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged. The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.

*Id.* at 444-45 (citations, ellipsis, and internal quotation marks omitted).

This court has previously held that "a criminal defendant proximately causes, and thus can be held criminally accountable for, all harms that are reasonably foreseeable consequences of his or her actions." *Blaize*, 21 A.3d at 81 (internal quotation marks omitted). It appears to be undisputed in this case that the jury could permissibly have found beyond a reasonable doubt that Michael Jones's death was reasonably foreseeable to Mr. Fleming. Although the United States in this case initially appeared to argue that reasonable foreseeability by itself sufficed to establish proximate cause in the current context, the United States acknowledged at oral argument that concepts of temporal attenuation are also relevant. For example, the United States took the position that a person who started a deadly feud between two groups might not properly be held criminally responsible for reasonably foreseeable killings that took place years or even a day after the person's initial conduct. We have no occasion to further address issues of temporal attenuation in this case, however, because no one has suggested that the requirement of proximate cause was defeated in this case due to the passage of time between Mr. Fleming's actions and the killing of Michael Jones.

Mr. Fleming and the amici instead argue that if Mr. Hamlin fired the fatal bullet, Mr. Fleming could not be the proximate cause of death. Specifically, they argue that one cannot properly be treated as having proximately caused a result if

the chain of events leading to the result includes the subsequent voluntary action of another. Put more concretely in the context of the present case, they argue that, for example, Mr. Hamlin's decision to fire his gun would be an intervening cause that would relieve Mr. Fleming of criminal responsibility for causing Michael Jones's death. We disagree.

The substantial weight of authority supports the conclusion that persons can be held criminally responsible for causing a result that would not have occurred but for the reasonably foreseeable acts of another. We have already mentioned our prior decisions in *Blaize*, 21 A.3d at 79-83, *Bonhart*, 691 A.2d at 162-64, and *McKinnon*, 550 A.2d at 916-19. *Ante* at 12. In each of those cases, we held a defendant criminally responsible for causing a death even though the death would not have occurred but for the reasonably foreseeable intervening acts of another. Many other courts have reached the same conclusion in various circumstances, including gun battles similar to that in the present case. *See, e.g.*, *United States v. Pineda-Doval*, 614 F.3d 1019, 1029 (9th Cir. 2010) ("Generally a police officer's conduct in pursuing a fleeing perpetrator, even if it was negligently performed and resulted in the death of the officer or a third party, is not deemed conduct so unusual, abnormal or extraordinary as to constitute [a] superseding cause.") (internal quotation marks omitted); *State v. Wilson*, 421 P.3d 742, 750 (Kan. 2018) ("[W]hen a defendant acts

with the requisite mens rea, and that act sets events in motion that lead to a victim's death, the defendant will be criminally liable for the death unless an unforeseeable event supersedes the defendant's act and becomes the sole cause of death, thus breaking the chain of proximate causation."); *Robinson v. State*, 782 S.E.2d 657, 660-62 (Ga. 2016) ("Proximate causation imposes liability for the reasonably foreseeable results of criminal conduct if there is no sufficient, independent, and unforeseen intervening cause."; store owner's shooting of defendant's accomplice in robbery was reasonably foreseeable) (ellipsis and internal quotation marks omitted); *Commonwealth v. Devine*, 26 A.3d 1139, 1150 (Pa. Super. Ct. 2011) (where defendant initiated gun battle on crowded street and victim was caught in cross-fire, finder of fact "could reasonably infer a causal nexus" between defendant's conduct and decedent's death); *People v. Lowery*, 687 N.E.2d 973, 976 (Ill. 1997) ("[W]hen a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within [the felon's] contemplation when the motion was initiated, [the felon] should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act."); *People v. Roberts*, 826 P.2d 274, 286, 297-303 (Cal. 1992) (defendant, one of several inmates who stabbed inmate Gardner, could be found to have proximately caused death of prison guard, who was fatally stabbed by Gardner as Gardner pursued one of his attackers). Commentators agree. *See, e.g.*, 1 LaFave § 6.4(f)(3), at 655 (action

of third party in response to defendant's conduct will "break the chain of legal cause" "only if [third-party's response] is abnormal (and, if abnormal, also unforeseeable)"; *Model Penal Code & Commentaries* § 2.03(1)-(3) (Am. Law Inst. 1985) (for offenses requiring proof of knowledge, intent, or recklessness, defendant's conduct is cause of result if, inter alia, conduct was but-for cause of result and result was "within the risk of which the actor is aware"); *id.* cmt. 3, at 262-64 (Model Penal Code "does not accept the view that volitional human intervention should be treated differently from other intervening causes"; "For example, if one of the participants in a robbery shoots at a policeman with intent to kill and provokes a return of fire by the officer that kills a bystander or an accomplice, the robber who initiated the gunfire could be charged with purposeful murder . . . .  Since [the robber's] conduct was a but-for cause of death and the actual result (the death of the bystander or accomplice) involved the same kind of injury as that designed or contemplated (the death of the policeman), a jury could convict [the robber] if the death of the bystander or accomplice was not deemed too remote or accidental to have a [just] bearing on the gravity of his offense.").  Finally, although tort law is informative rather than dispositive in the criminal context, *Paroline*, 572 U.S. at 444-45, widely accepted principles of tort law are to the same effect.  *See, e.g.*, *Restatement (Third) of Torts* § 34, Reporters' Note, cmt. d (Am. Law Inst. 2010) ("A strong majority of

courts employ a foreseeability test for independent intervening acts that consist of culpable conduct by another.").

In sum, substantial authority supports the conclusion that, for purposes of determining criminal responsibility, the intervening actions of a third party do not by themselves defeat proximate cause if those intervening actions were reasonably foreseeable to the defendant. We adopt that conclusion in this case. To illustrate the point concretely, we hold that a defendant can be viewed as having personally caused death if (1) the defendant, acting with an intent to kill, shoots at another person or takes other actions such as bringing an armed group in search of another person or brandishing a gun at another person, (2) the defendant's acts foreseeably cause the intended target or another person to fire shots in response; and (3) the latter shots fatally wound a victim.

We are not persuaded by the contrary arguments of Mr. Fleming and the amici. First, Mr. Fleming and the amici argue that in fact the weight of judicial authority rejects the idea that a defendant can be viewed as proximately causing a death where someone other than the defendant or an accomplice directly inflicted the fatal wound. We do not agree. Most of the cases relied upon by Mr. Fleming and the amici are felony-murder cases reflecting concerns about the scope of the

felony-murder doctrine. *Campbell v. State*, 444 A.2d 1034, 1041-42 (Md. 1982) (declining to extend felony-murder doctrine beyond "traditional common law limitation" holding defendants liable only for their own acts and those of their accomplices); *State v. Canola*, 374 A.2d 20, 29 (N.J. 1977) ("Most modern progressive thought in criminal jurisprudence favors restriction rather than expansion of the felony murder rule."); *Commonwealth ex rel. Smith v. Myers*, 261 A.2d 550, 555 (Pa. 1970) (given felony-murder doctrine's "weak . . . foundation, . . . it behooves us not to extend it further"); *State v. O'Kelly*, 84 P.3d 88, 97 (N.M. Ct. App. 2003) (noting "overwhelming trend towards limiting New Mexico's felony murder rule"). This court has not previously considered how the principles of causation we discuss in this opinion would apply in the context of a felony-murder prosecution, and we express no view on that topic, as to which courts are divided. As to the issue we do decide, the weight of authority discussed *supra* at pp. 23-26 supports the approach we follow in this decision.

Second, PDS relies on two Supreme Court cases involving civil liability for economic injury, *Bank of Am. v. City of Miami*, 137 S. Ct. 1296 (2017), and *Hemi Gp., LLC v. City of New York*, 559 U.S. 1 (2010). We do not view those cases as pertinent in the present context. In *Bank of America*, the Court emphasized that the issue of proximate cause arose in connection with a statute providing for economic

damages, where permitting recovery based solely on foreseeability would "risk massive and complex damages litigation." 137 S. Ct. at 1306 (internal quotation marks omitted). We see no basis for importing into homicide law the Court's conclusion that "[t]he general tendency in these cases, in regard to damages at least, is not to go beyond the first step." *Id.* (internal quotation marks omitted); *see also id.* at 1305 ("Proximate-cause analysis is controlled by the nature of the statutory cause of action.") (internal quotation marks omitted). The plurality opinion in *Hemi* is comparably limited in its scope. 559 U.S. at 10 ("[T]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.") (internal quotation marks omitted).

Third, Mr. Fleming and the amici rely heavily on Hart and Honoré's *Causation in the Law* and a law-review article, Sanford H. Kadish, *Complicity, Cause & Blame: A Study in the Interpretation of Doctrine*, 73 Calif. L. Rev. 323 (1985), to support the argument that voluntary acts of third parties necessarily defeat proximate cause. In our view, that reliance is misplaced for numerous reasons, including that: (1) the theory propounded in those two works does not appear to have significant support in the case law, and does not appear to have ever previously been mentioned by this court or the Supreme Court; (2) the concept of voluntariness reflected in *Causation in the Law* is unusual, in that it treats acts as involuntary, and

thus not defeating proximate cause, if the acts reflect "lack of control, lack of knowledge, [or] pressure exerted by others," Hart & Honoré, *Causation in the Law*, at 142, or, in an alternative formulation, are not "free, deliberate, and informed," *id.* at 326; (3) *Causation in the Law* treats intervening acts as defeating proximate cause only if, in addition to being free, deliberate, and informed, the acts are "intend[ed] to exploit the situation created by the first" actor, *id.*; (4) given the foregoing limitations, it is not at all clear that the analysis in *Causation in the Law* would preclude a finding of proximate cause in cases such as the present one, given that a decision by Mr. Hamlin to return fire could be viewed as reflecting "pressure exerted by others" and would not seem to reflect an intent to "exploit the situation" created by shots previously fired by Mr. Peoples or Mr. Fleming; and (5) Professor Kadish explicitly stated that he was not attempting to accurately describe current doctrine, Kadish, 73 Calif. L. Rev. at 325 (Professor Kadish did "not attempt to depict the state of the law in any particular jurisdiction at any particular time" and "felt free to conclude that certain propositions 'must' represent the law, even where few, if any, cases have had occasion so to hold.").

Fourth, PDS argues that, whatever the state of current law, this court is bound to interpret the second-degree-murder statute by applying the common law of causation as it existed in 1901, when Congress enacted the statute. This court,

however, has repeatedly rejected the view that the common law of the District of Columbia was "frozen" in 1901. *E.g.*, *Comber*, 584 A.2d at 35 n.5; *United States v. Jackson*, 528 A.2d 1211, 1216, 1219 (D.C. 1987); *United States v. Tucker*, 407 A.2d 1067, 1069 (D.C. 1979); *United States v. Bradford*, 344 A.2d 208, 216 (D.C. 1975); *Linkins v. Protestant Episcopal Cathedral Found.*, 187 F.2d 357, 360-61 (D.C. Cir. 1950). In this case, we decide issues of causation as to which there appears to have been no controlling authority in this jurisdiction in 1901, and in doing so we rely on a line of cases from this jurisdiction that reaches back over thirty years. *Supra* at 12, 23. Deciding such issues is well within this court's authority. To the extent that Mr. Fleming and the amici suggest that the issues we decide would be better left to the legislature, we do not agree. *See, e.g.*, *Rong Yao Zhou v. Jennifer Mall Rest., Inc.*, 534 A.2d 1268, 1273 (D.C. 1987) (noting "the role of courts in giving content to the common law"). Thus, for the reasons we have stated we hold that, for purposes of determining criminal responsibility, the intervening actions of a third party do not by themselves defeat proximate cause if those intervening actions were reasonably foreseeable to the defendant.

Fifth, Mr. Fleming argues that homicide liability in cases such as this should be limited to the deaths of innocent victims, not of culpable participants. We disagree, essentially for the reasons stated by the division. *Fleming*, 148 A.3d at

1179-81. Contrary to Mr. Fleming's contention, imposing homicide liability in cases involving the deaths of culpable participants is not an "unforeseeable" expansion of the criminal law denying defendants the fair notice essential to Due Process. *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964). Rather, this court in *Roy* explicitly noted that other courts had applied the gun-battle theory to cases involving culpable participants. 871 A.2d at 507 n.10. We therefore see no Due Process problem. *See Davis v. Moore*, 772 A.2d 204, 218 (D.C. 2001) (en banc) (rejecting due-process notice claim where court's ruling had been "forecasted explicitly" and courts in another jurisdiction had already adopted ruling).

Finally, PDS invokes the rule of lenity. The rule of lenity, however, "is a secondary canon of construction, and is to be invoked only where the statutory language, structure, purpose, and history leave the intent of the legislature in genuine doubt. For the reasons we have explained, the rule of lenity does not tip the balance in this case." *J.P. v. District of Columbia*, 189 A.3d 212, 222 (D.C. 2018) (citation and internal quotation marks omitted).

**2.**

Mr. Fleming and the amici raise several additional specific objections to the causation instructions given in this case. Before briefly addressing those objections, we pause to make explicit what so far has only been implicit. The causation principles we have discussed in this case are generally applicable in second-degree-murder cases, not special principles applicable in some distinctive way to gun battles. We therefore think that it may suffice for trial courts to instruct juries on homicide causation in more general terms, rather than by using an instruction tailored specifically to gun battles. The following is a model instruction on homicide causation for use in second-degree murder cases:

> One of the elements the government must prove beyond a reasonable doubt to establish the charge of second-degree murder is that [insert name of the defendant] caused the death of [insert name of the decedent].

> To prove that the defendant caused the decedent's death, the government must prove two things beyond a reasonable doubt:

> First, the government must prove that the decedent's death occurred as a result of an action by the defendant. In other words, the government must prove that in the absence of an action by the defendant the decedent's death would not have occurred.

> Second, the government must prove that there is a close connection between the defendant's action and the

decedent's death. You may find that a close connection exists if, at the time of the defendant's action, the defendant knew or reasonably should have known that the action might result in the death of or serious bodily injury to the decedent [or another person]. On the other hand, you may not find that a close connection exists if the series of events leading from the defendant's action to the decedent's death is highly unusual, abnormal, or extraordinary [or too lengthy].

[There is evidence in this case that the defendant did not personally inflict the decedent's fatal injury and that the decedent's fatal injury instead was inflicted by a third party. Under such circumstances, the defendant can be found to have caused the decedent's death only if, applying the instruction you were just given, the decedent's death occurred as a result of the defendant's action and there is a close connection between the defendant's action and the decedent's death.]

[A defendant who does not personally cause death may in some circumstances nevertheless be held criminally responsible for the death. [Specifically, a defendant who aided and abetted a person in the commission of second-degree murder can in some circumstances be found guilty of second-degree murder even if the defendant's individual actions were not a cause of the decedent's death. Later in these instructions I will tell you about the requirements of aiding-and-abetting liability.] [Specifically, a defendant who conspired with another person can in some circumstances be found guilty of second-degree murder even if the defendant's individual actions were not a cause of the decedent's death. Later in these instructions I will tell you about the requirements of coconspirator liability.]]

This model instruction is not designed to address the issue of causation under the felony-murder statute. See *supra* at 27 (leaving open whether causation operates differently under felony-murder statute). The instruction also does not address situations in which the decedent was dying anyway and the claim is that the decedent hastened death. *Id.* at 16. Although the instruction includes bracketed language to flag the issue of temporal attenuation, the instruction does not attempt to provide any concrete guidance about that issue, because the issue was not raised in this case. *Id.* at 22. The instruction does not address the unusual situation in which the theory is that the defendant caused death by an omission rather than an action. Finally, the instruction does not attempt to address the issue of "multiple sufficient causes." *Id.* at 16.

In light of the foregoing, it is not necessary to address most of the remaining objections to the particular gun-battle instruction in this case. We do briefly address one topic raised by PDS: the issue of concurrence. We have said that, "[i]f either the actus reus—the unlawful conduct—or the mens rea—the criminal intent—is missing at the time of the alleged offense, there can be no conviction. Reducing it to its simplest terms, a crime consists in the concurrence of prohibited conduct and a culpable mental state." *Rose v. United States*, 535 A.2d 849, 852 (D.C. 1987) (internal quotation marks omitted). We have recently suggested that the concept of

concurrence contains exceptions and presents complications. *Dawkins v. United States*, 189 A.3d 223, 231 & n.11 (D.C. 2018). At least in general, though, considerations of concurrence would suggest that a defendant's acts that lead to a later death could provide the basis for a conviction for second-degree murder only if, at the time the defendant took those acts, the defendant had the mental state required for second-degree murder: intent to kill, intent to inflict serious bodily injury, or conscious disregard of the risk of death or serious bodily injury. *Walker v. United States*, 167 A.3d 1191, 1201 (D.C. 2017).

**3.**

We respond briefly to the separate concurrence of Judges Beckwith and Easterly.

1. The concurrence argues that the court should not address one of the issues the court decides: "how proximate cause operates when there is a third-party intervenor." *Infra* at 45. We disagree. That issue was fully briefed by the parties and PDS and was discussed extensively at oral argument. Although the concurrence

states that the United States has never identified any action by Mr. Fleming that was a but-for cause of Michael Jones's death, *infra* at 45-46, that is incorrect. In its brief in this court, the United States does identify an act by Mr. Fleming that the United States contends could well have been a but-for cause of Michael Jones's death: the firing of shots that either directly killed Michael Jones or caused Mr. Hamlin to fire back and inadvertently kill Michael Jones. More generally, we are vacating Mr. Fleming's conviction and remanding for further proceedings, which presumably means a retrial at which the issues the court decides are likely to recur. It is our typical practice to decide such issues. *See, e.g.*, *Ill. Farmers Ins. Co. v. Hagenberg*, 167 A.3d 1218, 1232 (D.C. 2017) (deciding "[s]everal issues likely to arise on remand"). In support of the contrary contention, the concurrence relies almost entirely on cases that are inapposite, because they do not involve a court deciding issues that were fully briefed and can be expected to arise in proceedings on remand. *Infra* at 46-48. We also note that the author of the en banc concurrence previously perceived no obstacle in this case to opining at length on issues of proximate cause and the intervening acts of third parties. *Fleming*, 148 A.3d at 1187-92 (Easterly, J., concurring in part and concurring in the judgment), *vacated*, 162 A.3d at 72.

2. The concurrence states that the opinion for the court acknowledges that the meaning of the second-degree murder statute was frozen in 1901. *Infra* at 52-53.

That is not an accurate description of either the opinion for the court or the scope of the court's common-law authority. The opinion for the court acknowledges that the District of Columbia's second-degree murder statute codified the common-law definition of that offense, but the opinion for the court explicitly rejects the view that the court's authority to interpret the second-degree murder statute was frozen in 1901. *Supra* at 30. It also is not accurate to describe the opinion of the court as "def[ying] basic principles of separation of powers," by "grafting" new and expanded principles of causation onto the second-degree murder statute. *Infra* at 55. Rather, as we have explained, *supra* at 30-31, we are deciding an issue of causation as to which there appears to have been no controlling authority in this jurisdiction in 1901. In doing so, moreover, we rely on cases from this jurisdiction reaching back over thirty years. *Supra* at 12, 23.

3. According to the concurrence, if there was any lack of clarity on the issue under the common law in 1901, then we are required by the rule of lenity to resolve the issue of proximate cause in favor of Mr. Fleming. *Infra* at 56-57. That contention substantially overstates the proper function of the rule of lenity. *See, e.g.*, *Mattis v. United States*, 995 A.2d 223, 226 n.7 (D.C. 2010) (rule of lenity "can tip the balance in favor of criminal defendants only where, exclusive of the rule, a penal statute's language, structure, purpose and legislative history leave its meaning

genuinely in doubt"); *Alvarez v. United States*, 576 A.2d 713, 714-15 (D.C. 1990) (rule of lenity does not "require courts to give criminal statutes their narrowest possible interpretation"); *cf., e.g.*, *Shaw v. United States*, 137 S. Ct. 462, 469 (2016) (rule of lenity "applies if at the end of the process of construing what Congress has expressed, there is a grievous ambiguity or uncertainty in the statute") (citation and internal quotation marks omitted).

For the foregoing reasons, we vacate Mr. Fleming's conviction for second-degree murder while armed and remand the case for further proceedings. Mr. Fleming does not challenge his other convictions, which we therefore affirm.

*So ordered.*

FISHER and THOMPSON, *Associate Judges*, concurring: We join the opinion of the court but add this brief concurring statement to emphasize key principles on which the court relies. We also attempt to make a few points about issues that will arise in future cases like this. There inevitably will be such cases because gun battles occur on the streets of the District of Columbia with depressing frequency, often with lethal results.

We highlight the following important holdings of the court: "for purposes of the District of Columbia's homicide statutes, 'kill' means 'cause death,'" *ante* at 12; "a defendant whose actions are not a but-for cause of death can nevertheless be guilty of homicide," *ante* at 17; "a defendant can be viewed as having personally caused death if (1) the defendant, acting with an intent to kill, shoots at another person or takes other actions such as bringing an armed group in search of another person or brandishing a gun at another person, (2) the defendant's acts foreseeably cause the intended target or another person to fire shots in response, and (3) the latter shots fatally wound a victim," *ante* at 26; and "the intervening actions of a third party do not by themselves defeat proximate cause if those intervening actions were reasonably foreseeable to the defendant." *Ante* at 30. We conclude from these and other portions of the opinion that the gun battle theory survives, meaning that it is not necessary (or perhaps not always necessary) to trace a fatal shot to the gun fired by a particular defendant.

The facts surrounding a "gun battle" may apply to the elements of second-degree murder in at least three ways. First, they may prove that the defendant acted with a "depraved heart." *See Comber v. United States*, 584 A.2d 26, 39 (D.C. 1990)

(en banc) (discussing depraved heart malice). They also complicate the analysis of causation. *See Roy v. United States*, 871 A.2d 498 (D.C. 2005). Third, they may demonstrate a form of vicarious liability not necessarily encompassed by or congruent with aiding and abetting or co-conspirator liability.

In this case the focus has been on causation, and the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 204 (2014), undoubtedly "provides a useful general framework," *ante* at 14, for discussing that issue. That framework fits awkwardly around the facts of this case, however, because *Burrage* does not address how the concept of but-for causation interacts with principles of vicarious liability. Our court thus acknowledges that "more complicated issues can arise from the interaction between the requirement of but-for causation and concepts of vicarious liability, such as aiding and abetting and coconspirator liability." *Ante* at 16. This court will face those "more complicated issues" in future cases because, in our view, the urban gun battle theory is based upon concepts of vicarious liability.

We are not accustomed to saying that a gunman was aiding and abetting an opponent who was trying to kill him, and this may be the reason the government did not argue that Mr. Fleming could be considered to have aided and abetted Mr.

Hamlin. But aiding and abetting is not the only form of collective criminal conduct. The Court of Appeals of Maryland confronted an analogous case in *Alston v. Maryland*, 662 A.2d 247 (Md. 1995), where the fatal shot which killed an innocent bystander was fired by one of Alston's opponents. The court rejected Alston's argument "that his conduct cannot be the actual cause of Ms. Edmonds's death." *Id*. at 251. That view of the case was too narrow, the court said. "The relevant frame of reference . . . [was] Alston's participation in the gun battle." *Id*. at 252. "There would have been no mutual combat, and no murder of an innocent person, but for the willingness of both groups to turn an urban setting into a battleground." *Id.; see also Alston v. Maryland*, 643 A.2d 468, 474 (Md. Ct. Spec. App. 1994) ("the lethal conduct in this case was the shoot-out itself").


We do not suggest that the articulation of these principles by the Maryland courts is necessarily correct, but these opinions from our neighboring jurisdiction illustrate that this court will need to devote more effort to explaining the interaction of but-for causation and vicarious liability in the context of a gun battle (and to crafting an instruction which describes that interaction for the jury).

This court also will need to focus in future cases on what it means to initiate a gun battle. Firing the first shot will suffice, of course, but we also would hold that one may initiate a gun battle without firing the first shot (by, for example, pointing a gun menacingly at an opponent). We understand the court's opinion to imply that (or at least leave open the possibility that), if Hamlin inadvertently shot Jones in a foreseeable response to an attack initiated by Fleming and Peoples with the requisite *mens rea*, then Fleming could be found guilty of second-degree murder under the but-for and proximate causation principles enunciated in the opinion, and/or as a co-conspirator/aider and abettor of Peoples.

EASTERLY, *Associate Judge*, with whom BECKWITH, *Associate Judge*, joins, concurring in the judgment: Sitting en banc, this court is called upon to interpret a statute, D.C. Code § 22-2103 (2012 Repl.), which creates a gradation of the crime of murder. The relevant text provides "[w]hoever with malice aforethought . . . kills another[] is guilty of murder in the second degree." More than a century after this statute was enacted by Congress, a division of this court in *Roy v. United States*, 871 A.2d 498, 506, 507 (D.C. 2005), conceived of an "urban gun battle theory of liability" to expansively interpret its reach. Pursuant to this theory, *Roy* held that individuals identified by the court as "street combatants"—that is, people carrying guns—could be convicted as principals of second-degree murder based on a showing

that their conduct was a "substantial factor in bringing about the death" at issue. *Id.* at 506 n.8; *see also id*. at 508. The jury in Bernard Fleming's case was instructed to rely on *Roy*'s urban gun battle theory to determine whether Mr. Fleming was guilty of second-degree murder in connection with the death of Michael Jones. Today the en banc court unanimously concludes this was reversible error.[1]

We agree that a question of statutory interpretation is preserved for our de novo review. *Ante* at 7–9. We write separately to endorse and fortify the following pillars of the majority opinion's analysis:

- The 1901 Congress incorporated well-settled common law causation requirements into our second-degree murder statute. *See ante* at 9–10 (citing *Comber v. United States*, 584 A.2d 26, 38 n.9 (D.C. 1990) (en banc) (acknowledging the second-degree murder statute enacted by Congress "embodied the substance of murder as it was known to the common law" (quotation marks omitted))); *see also Carrell v. United States*, 165 A.3d 314, 319 n.12 (D.C. 2017) (en banc) (explaining that "[o]rdinarily, this court looks to the legislature to set forth the basic actus reus elements it wishes to criminalize" but where the legislature "codifies common law crimes," we assume it "intends to incorporate the well-settled meaning of the common-law terms it uses" (internal quotations and citations omitted)).
- To "kill" means to "cause death." *Ante* at 10–12;
- "The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause." *Ante* at 14 (quoting *Burrage v. United States*, 571 U.S. 204, 210 (2014)).

---

[1] But see *infra* note 2.

- Actual cause requires a showing beyond a reasonable doubt that "the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Ante* at 14 (quoting *Burrage*, 571 U.S. at 211).

- Legal cause is an additional limiting principle requiring a showing beyond a reasonable doubt that the defendant's action was not only a but-for cause but had "a sufficient connection to the result," *ante* at 21 (quoting *Paroline v. United States*, 572 U.S. 434, 444 (2014)), often (but not exclusively) analyzed in terms of timing and reasonable foreseeability, *ante* at 21–22.

- And, the common law principle of concurrence must be satisfied—namely, "a defendant's acts that lead to a later death c[an] provide the basis for a conviction for second-degree murder only if [the government proves that], at the time the defendant took those acts, the defendant had the mental state required for second-degree murder." *Ante* at 34–35; *see also Morissette v. United States*, 342 U.S. 246, 251 (1952) (Crime is "a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand.").

By reaffirming and applying these principles in the interpretation of D.C. Code § 22-2103, the en banc court overrules *Roy*.[2]

---

[2] The concurring opinion of our colleagues Judge Fisher and Judge Thompson seeks to reaffirm *Roy* and, in that regard, is really a dissent. Taking out of context a statement made by the majority in a discussion of aiding and abetting liability, *ante* at 17, the opinion states that "a defendant whose actions are not a but-for cause of death can nevertheless be guilty of homicide," *see ante* at 39 (Fisher and Thompson, JJ., concurring). It asserts that "collective criminal conduct" and "vicarious liability not necessarily encompassed by or congruent with aiding and abetting or co-conspirator liability" can provide the foundation for a murder conviction in the District. *Id.* at 39–40. And it announces that *Roy*'s "gun battle theory survives." *Id.* at 39. This broader conception of murder liability is endorsed only by its authors and cannot be squared with the majority opinion's holding.

The majority opinion goes further, however, and pronounces that the crime of second-degree murder extends to a hypothetical circumstance where a defendant has taken an earlier action in the causal chain of a death, notwithstanding that a third party voluntarily and independently takes a later action that is both a but-for and a more immediate cause of death.[3] *Ante* at 23–31. For multiple reasons, we disagree with this analysis.

Preliminarily, this case is not a proper vehicle to definitively resolve how proximate cause operates when there is a third-party intervenor in a murder case. It is enough for us to say that *Roy* both incorrectly dispensed with the requirement of actual cause and misinterpreted the concept of proximate cause to create and extend criminal responsibility in situations where but-for cause was unproven. We should not go further and opine on whether the action of a third party more immediately causing a death does, or does not, cut off a defendant's criminal responsibility in a case where the government has never identified any action taken by Mr. Fleming

---

[3] Our colleagues apparently do not entirely preclude consideration of the intervening acts of third parties, but note instead that "the intervening actions of a third party do not *by themselves* defeat proximate cause if they were reasonably foreseeable" to a defendant whose action was a but-for cause of death. *See ante* at 26 (emphasis added); *see also id.* at 22 (acknowledging that temporal attenuation is also a legitimate concern in assessing proximate cause).

that was a but-for cause of Mr. Jones's death.[4] Presumably, it would have if it could have. Instead, the government sought to rely on *Roy*'s less causally demanding urban gun battle theory.

There is thus good reason to believe that but-for cause is unprovable in Mr. Fleming's case, especially in light of the government's failed attempt on appeal,

---

[4] All the government established was that Mr. Fleming inferably possessed and fired a gun at a time when other individuals were shooting—but (1) one of the guns the government tried to connect to Mr. Fleming was fully loaded and could not have fired casings of the size recovered at the scene in any event; (2) the other gun theoretically could have done so but was missing its slide, barrel, and magazine, and thus, at least at the time of recovery, was inoperable; and (3) although both guns were swabbed for DNA and fingerprints, the results were inconclusive.

Even accepting that the government proved beyond a reasonable doubt that Mr. Fleming possessed and fired a gun, much remains unclear and it may well be that the scenario described in the majority opinion that would preclude a determination of but-for cause, *ante* at 18–19, is exactly what happened. By contrast, in all the cases our colleagues cite where this court has held that that the intervening act of a third person did not cut off a defendant's criminal responsibility, the government had proved beyond a reasonable doubt an action by the defendant that was a but-for cause of the decedent's death. *See Blaize v. United States*, 21 A.3d 78, 80 (D.C. 2011) (decedent hit by car of third-party driver after defendant shot at decedent causing him to run into oncoming traffic); *Bonhart v. United States*, 691 A.2d 160, 162 (D.C. 1997) (defendant set decedent's building on fire causing decedent to enter the burning building in an attempt to save his dog); *McKinnon v. United States*, 550 A.2d 915, 916 (D.C. 1988) (defendant slashed decedent's throat causing him to go to seek medical treatment and incur an infection).

*see ante* at 18, to argue that it in fact proved but-for cause at trial.[5] As this court has previously explained, "an issue is ripe for adjudication only when the parties' rights may be immediately affected by it," *Allen v. United States*, 603 A.2d 1219, 1229 n.20 (1992) (en banc) (citing *Smith v. Smith*, 310 A.2d 229 (D.C. 1973)). But "where the ultimate question depends on contingencies which may not come about[,] that question is not ripe for judicial resolution," and it is "beyond [the] power" of a court to issue an opinion resolving that question. *Smith*, 310 A.2d at 231; *see also Udebiuwa v. District of Columbia Bd. of Med.*, 818 A.2d 160, 165 (D.C. 2003) (Schwelb, J. concurring) (citing *Allen* for the proposition that "[e]ven when we sit en banc, we generally decline to issue guidelines which are not required to decide the case before us").[6]

---

[5] We are nonetheless compelled to remand because Mr. Fleming never argued that the government's evidence was legally insufficient to establish but-for cause beyond a reasonable doubt, and even after amicus argued that the evidence was insufficient, he did not adopt that argument.

[6] The majority opinion notes that the concurrence to the panel opinion in *Fleming* "perceived no obstacle" to discussing proximate cause. *Ante* at 36. There is a distinction with a difference between the panel concurrence and the majority opinion for the en banc court. The concurrence called for *Roy* to be overruled based on its comprehensive explication of the many flaws in the urban gun battle theory. *See Fleming v. United States*, 148 A.3d 1175, 1187-89 (D.C. 2016) (Easterly, J., concurring in the judgment), *vacated*, 164 A.3d 72 (D.C. 2017) (explaining that causation has two parts, but-for and proximate cause; that "only if . . . but for cause is established do we ask whether the defendant's actions are the . . . proximate cause of the harm"; that "the causation analysis in *Roy* is flawed both as to actual cause, which it failed to consider, and as to proximate cause, which

Alternatively, assuming the government can identify and prove beyond a reasonable doubt that Mr. Fleming took some action within the causal chain leading to Mr. Jones's death, there is good reason to believe that this action was significantly removed from Mr. Jones's death and Mr. Fleming's criminal responsibility was arguably attenuated to such a degree that a conviction for the most serious crime of murder is unjustified. If the en banc court had to confront the government's to-be-determined, actual theory of but-for cause and then assess whether it survived the vetting of proximate cause, a majority of judges might not be so categorical about the irrelevance of the actions of third-party intervenors. The recognition that the particular facts of a case matter is precisely why advisory opinions are generally condemned. *See Stearns v. Wood*, 236 U.S. 75, 78 (1915) ("The province of courts is to decide real controversies, not to discuss abstract propositions."); *see also United States v. Fruehauf*, 365 U.S. 146, 157 (1961) (condemning the "advance expressions of legal judgment upon issues which remain unfocused because they are not pressed

---

it defined incorrectly"; that *Roy* incorrectly understood proximate cause as extending criminal liability instead of limiting it; and lastly that "[i]mplicit in *Roy*'s theory of proximate causation for urban gun battles, however, is an assumption that another person's act of firing a fatal shot can be a 'foreseeable' event that does not break the causal chain between the defendant's actions . . . and a resulting death"). Having granted en banc review, the full court is not obligated to employ a similar comprehensive approach to resolve Mr. Fleming's case, particularly when it incorporates analysis that is wrong. See *infra*.

before the court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests.").

In short, in a case where the threshold legal showing (but-for cause) has yet to be made—and may never be—issuing an opinion in which we resolve a debate regarding a secondary legal question (proximate cause) is procedurally and substantively unfounded. Further, even if it were proper for the en banc court to address this issue, the majority opinion's third-party intervenor analysis defies well-settled common law principles of causation.

Mr. Fleming and his amici are correct that, if Mr. Hamlin fired the fatal bullet, Mr. Fleming could not be the proximate cause of death. This conclusion is compelled by longstanding fundamental principles of our criminal justice system that we do not punish individuals for the independent, voluntary actions of others.[7]

---

[7] This is in stark contrast to tort law, where individuals may be held vicariously liable for the actions of others. But the aims of tort law (to establish who should bear the burden of loss) and criminal law (to punish) are clearly different. *See Campbell v. State*, 444 A.2d 1034, 1041 (Md. 1982). For this reason, courts

*See generally Fleming v. United States*, 148 A.3d 1175, 1185–90 (D.C. 2016) (Easterly, J., concurring in the judgment), *vacated*, 164 A.3d 72 (D.C. 2017). This common law prohibition against criminally punishing individuals for the independent, voluntary actions of others comes into clear relief when one looks at the limited exceptions to the rule, and the efforts to expand those exceptions. For example, as the majority opinion explains, *ante* at 17–18, individuals who have not

---

have declined to import into criminal law the broader conception of proximate cause from tort law. *See id.* (explaining that "the tort liability concept of proximate cause" only has "shallow relevance" to the analysis of causation in criminal cases and "is generally too broad and comprehensive to be appropriate in a criminal proceeding"); *Commonwealth v. Root*, 170 A.2d 310, 314 (Pa. 1961) (explaining that "the tort liability concept of proximate cause has no proper place in prosecutions for criminal homicide and more direct causal connection is required for conviction"); *see also United States v. Schmidt*, 626 F.2d 616, 618 n.3 (8th Cir. 1980) (citing *Root* and other cases) (expressing difficulty with an instruction that "could be construed as importing wholesale into the criminal law the far-extended tort law concept of proximate causation" and stating that "we believe that some proof of some more direct causal connection between act and result should be required in criminal cases than would be sufficient to uphold liability in tort"); *ante* at 25 (acknowledging that tort law is not "dispositive" in the criminal context).

That said, even in the context of tort law, until well into the twentieth century, decades after Congress enacted the District's second-degree murder statute, it was unclear in this jurisdiction that the independent, voluntary actions of a third-party intervenor would not cut off proximate cause. *See, e.g.*, *Ross v. Hartman*, 139 F.2d 14 (D.C. Cir. 1943) (explaining that in a 1916 decision in a personal injury action "this court held that the defendant's act in leaving [his] car unlocked was not a 'proximate' or legal cause of the plaintiff's injury [of getting run over] because the wrongful act of a third person [who stole the car] intervened," but that the court could not "reconcile that decision with facts which have become clearer and principles which have become better established than they were" and thus concluding that the 1916 decision "should be overruled").

taken an action in the causal chain of a homicide "nevertheless" may be held criminally responsible for the actions of those with whom they are complicit.

Felony murder jurisprudence is another example. The majority opinion seeks to put these cases to one side and declares that, without them, the "weight of authority" supports its approach. *Ante* at 27–28. These cases are relevant and important precisely because they are felony murder cases: If under well-settled principles of causation a defendant could be convicted of murder for the voluntary actions of a noncomplicit third-party intervenor, prosecutors across the country would never have asked courts to apply a felony murder analysis to this scenario, and a split never would have emerged between the "proximate cause" theory of felony murder (extending a defendant's criminal responsibility to the actions of noncomplicit third-party intervenors) and the agency theory of felony murder (limiting criminal culpability "to lethal acts committed by the felons themselves or their accomplices"). *Campbell v. State*, 444 A.2d 1034, 1040 (Md. 1982); *see also id*. at 1040–41 (explaining that the "present trend has been for courts to employ the agency theory"); *Waller v. United States*, 389 A.2d 801, 807 (D.C. 1978) (rejecting proximate cause theory of felony murder in D.C. and endorsing agency theory instead). Thus, the cases the majority opinion cites endorsing the (minority view)

proximate cause theory of felony murder[8] do not support its conclusion; rather they corroborate the settled understanding of the limited reach of common law causation principles.[9] To this, the majority opinion has no response.

Instead, our colleagues effectively accept that settled common law causation principles may not support their third-party intervenor analysis when they argue that the District's common law is not "frozen" in time. *Ante* at 30. Of course, it is generally true that the common law is meant to evolve. *See, e.g.*, *Linkins v. Protestant Episcopal Cathedral Found.*, 187 F.2d 357 (D.C. Cir. 1950) (rejecting the argument in a probate case that, "absent a statute on a particular legal question, the common law as it existed in 1801—not as it has grown and developed to the present time—governs"); *ante* at 30 (relying on *Linkins*). But when we are trying to discern what Congress sought to punish as second-degree murder when it codified

---

[8] *See ante* at 24 (citing *Robinson v. State*, 782 S.E.2d 657, 660–62 (Ga. 2016); *People v. Lowery*, 687 N.E.2d 973, 976 (Ill. 1997)). The majority opinion does not acknowledge that these are proximate-cause-theory-of-felony-murder cases.

[9] The majority opinion's reliance on *Commonwealth v. Devine*, 26 A.3d 1139, 1150 (Pa. Super. Ct. 2011), is inapt because the court upheld a murder conviction for death of a bystander based on an interpretation of Pennsylvania's causation statute. *Ante* at 24. *Devine* sheds no light on the proper understanding of common law causation principles. Similarly, the cases the majority opinion cites where the third-party intervenor's action was not autonomous or involved less than autonomous choices—which includes all cited opinions from this court, see *supra* note 4—do not support its conclusion.

that common law crime in D.C. Code § 22-2103, the common law *is* "frozen" at the year of the statute's enactment in 1901, as our colleagues acknowledge in their discussion of but-for cause. *Ante* at 9–10 (explaining that the District's murder statute codified "the common law definition of murder"); *id*. at 11 (quoting *Carrell*, 165 A.3d at 319 n.12 ("It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses.") (quoting *Sekhar v. United States*, 570 U.S. 729, 732 (2013) (quoting *Neder v. United States*, 527 U.S. 1, 23 (1999)))); *id*. at 15 (concluding that a showing of but-for cause is required first and foremost because it is "part of the traditional understanding of cause"); *see also Bishop v. United States*, 107 F.2d 297, 301 (D.C. Cir. 1939) ("Although distinction is made in the severity of punishment for the degrees of murder, the statute embodies the substance of murder as it was known to the common law") (citing *Hill v. United States*, 22 App. D.C. 395, 402 (D.C. Cir. 1939)); *Hill*, 22 App. D.C. at 402 ("The definition of [first degree] murder as given in section 798 of the Code is the common-law definition of that crime, as we find it in the 4th book of Blackstone's Commentaries, page 195, transcribed from the 3d Institute of Coke, page 47. It is not, therefore, a new or statutory definition of murder, but simply the common-law definition of that crime.").[10] None of the

---

[10] Thus, this court has reaffirmed on numerous occasions that when interpreting common law crimes codified by the D.C. Code, "*the* common law" in

cases cited by our colleagues in the majority, *see ante* at 30, interprets a statute codifying a common law offense in such a way as to expand beyond its settled common law understanding the scope of the conduct deemed punishable as that crime, much less endorses such judicial activism.[11]

---

the historical sense—not *a* common law—"definition is controlling." *Perkins v. United States*, 446 A.2d 19, 23 (D.C. 1982) (emphasis added) (examining the common law history of the malicious disfigurement statute); *see also Contreras v. United States*, 121 A.3d 1271, 1274 (D.C. 2015) (observing that "[b]ecause the statute does not specify the elements of assault, the common law definition of the offense controls" (quotation marks omitted)); *United States v. Bradford*, 344 A.2d 208, 213 (D.C. 1975) (same for manslaughter statute).

[11] To the contrary, in both *Bradford*, 344 A.2d 208, and *Comber*, 584 A.2d 26, this court adhered to the historical, pre-D.C. Code, common law understanding of the crime of manslaughter, in particular the understanding that voluntary and involuntary manslaughter are separate offenses. *Bradford*, 344 A.2d at 213, 216 (determining that the common law understanding of manslaughter is "controlling," and that the distinct crimes of voluntary and involuntary manslaughter "have been recognized at common law since Blackstone's time"); *accord Comber*, 584 A.2d at 37. And although we observed in a footnote in *Comber* that a D.C. Code provision that incorporates "Maryland common law in effect as of 1801" (now-D.C. Code § 45-301), 584 A.2d at 35 n.5, did not "freeze the common law as it existed in 1801" and was no "bar to the exercise of our inherent power to alter or amend the common law," *id.* (internal quotation marks omitted), we neither held that there were no other limits on this power nor endorsed the exercise of such power to alter the meaning of a statute codifying the common law crime of manslaughter so as to expand criminal liability thereunder.

*Linkins*, 187 F.2d 357, and *United States v. Tucker*, 407 A.2d 1067, 1069 (D.C. 1979), are simply inapposite. As noted above, *Linkins* is a probate case, not a criminal case. In *Tucker*, this court rejected the common law rule for computing age—that "a person is deemed to have reached a given age on the day preceding the anniversary of his birth"—and did not purport to expand the scope of conduct punishable as a common law crime. 407 A.2d at 1069.

When it codified the common law crime of murder, Congress did not delegate to this court the authority to reshape and expand this crime to our liking. By grafting onto D.C. Code § 22-2103 its view that a defendant should be held criminally responsible for a death actually and more immediately caused by the voluntary action of an independent third-party intervenor, the majority opinion defies basic principles of separation of powers. As the Supreme Court has explained, "[t]he definition of the elements of a criminal offense is entrusted to the legislature," *Liparota v. United States*, 471 U.S. 419, 424 (1985), and "[t]he spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes

---

Only *United States v. Jackson*, 528 A.2d 1211, 1220 (D.C. 1987), in which this court abrogated the common law rule limiting homicide prosecutions to cases where the victim died within a year and a day of the infliction of injury, comes anywhere close to providing the sort of quasi-legislative authority the majority seeks. But *Jackson* is both (1) distinguishable: as we explained, the year-and-a-day rule was archaic, rarely enforced, obsolete in light of advances in forensic pathology, and almost universally criticized, 528 A.2d at 1216—none of which can be said for the common-sense principle that defendants are not criminally responsible for the independent, autonomous actions of third parties; and (2) anomalous: we have exercised this power in no subsequent case and instead have cast doubt upon *Jackson*, questioning whether our power to make new common law "permits us to expand, by judicial decree, the scope of a statutory criminal offense." *Little v. United States,* 709 A.2d 708, 714 (D.C. 1998) (citing *Jackson*, 528 A.2d at 1216) (only "[a]ssuming, without deciding" that we had such power, noting that any such authority would have to be "exercised with restraint, lest we intrude upon the prerogatives of the legislative branch and the liberties of the citizen," and declining to use this power to expand accessory-after-the-fact liability).

that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute," *Morissette*, 342 U.S. at 263 (footnote omitted). This court sitting en banc has previously resisted the urge to engage "in legislative activity," recognizing that "[t]his is not the court's function." *Gorham v. United States*, 339 A.2d 401, 406–07 (D.C. 1975) (en banc) (recognizing that "an appellate court may not supersede the expressed legislative will—always barring, of course, unconstitutionality"—and observing that the impropriety of "usurping the function of the legislative branch" in this manner is "well nigh indisputable," *id.* at 407 n.23). It should again resist that urge in this case.

Lastly, even accepting for the sake of argument that, at the time Congress enacted the District's murder statute, common law conceptions of proximate cause and third party intervenors in criminal law were unsettled or unclear, *see ante* at 30 (stating that the majority opinion "decide[s] issues of causation as to which there appears to have been no controlling authority in this jurisdiction in 1901"); *see also id.* at 37 (again acknowledging the lack of "controlling authority in this jurisdiction

in 1901"), the rule of lenity applies.[12] Our colleagues acknowledge that the rule of lenity applies in their but-for-cause analysis. *Ante* at 15 (concluding that a showing of but-for cause is required because "the rule of lenity precludes giving the statutory text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant"); *see also id*. at 31 (observing that the rule of lenity applies "where the statutory language, structure, purpose, and history leave the intent of the legislature genuinely in doubt"). But in their proximate cause analysis, they assert that our concurrence "substantially overstates the proper function of the rule." *Ante* at 37. We rely on the meaning of the rule as articulated by this court, *see Carrell*, 165 A.3d at 322 n.22 (under the rule of lenity, this court "adopt[s] the less harsh interpretation of an otherwise ambiguous [criminal] statute and leave[s] it to the legislature to clarify statutory terms if it wishes harsher or broader application"), and the Supreme Court, *see Liparota*, 471 U.S. at 424 (explaining that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," inter alia, to "strike[] the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability").

---

[12] Alternatively, to the extent our colleagues argue that there is no "genuine" dispute about how common law principles of causation apply in a murder case when there is a third party intervenor, *see ante* at 32, the above discussion speaks for itself.

This brings us back to where we started. Our court is sitting en banc to interpret a statute, D.C. Code § 22-2103. If that statute, enacted by Congress over a century ago, does not clearly punish certain conduct the government now wishes to prosecute as the most serious crime of murder (as opposed to some lesser offense), it is not the role of this court to give the government that authority—either under a made-up urban gun battle theory or some other exercise of common law creativity. Rather, it is the role of the District's legislature, now the Council for the District of Columbia, to amend the statute to reflect the views of the District's citizens.

As it happens, in 2016 the legislature established and funded an independent agency, the D.C. Criminal Code Reform Commission (CCRC), to reexamine the District's antiquated criminal code and make recommendations for "reform."[13] D.C. Code §§ 3-151, -152 (2016 Repl.); *see generally* CCRC website, https://ccrc.dc.gov. Now in its fourth year, the CCRC is on track to present its "combined, final reform recommendations . . . to the Council and Mayor by the agency's statutory deadline" in September 2020. CCRC, FY 2019, Fourth Quarter Report (2019), https://ccrc.dc.gov/sites/default/files/dc/sites/ccrc/publication/attachments/CCRC-

---

[13] The CCRC has been working with a Code Revision Advisory Group comprised of stakeholders in the District's criminal justice system. *See* D.C. Code § 3-153 (2016 Repl.).

FY-2019-Fourth-Quarter-Report-of-Activities.pdf; *see also* D.C. Code § 3-156 (2016 Repl.). Thereafter the Council presumably will discuss and debate the Commission's recommendations, including those regarding causation. CCRC, Compilation of Draft Revised Criminal Code Commentary to Date, RCC § 22E-204. Causation Requirement (2019), https://ccrc.dc.gov/sites/default/files/dc/sites/ccrc/publication/attachments/4-15-19-Compilation-of-RCC-Draft-Commentary-Subtitle-I.pdf. Our colleagues in the majority should let the legislature do its work and not inject this court into an upcoming public policy debate about the scope of our criminal laws.